1842.

Burr
v.
Burr.

---

BURR *vs.* BURR.

A condonation by the wife of cruel treatment on the part of the husband is subject to the implied condition that he shall thereafter treat her with conjugal kindness. And subsequent acts of cruel treatment will revive the previous injury which had been conditionally forgiven.

Condoned cruelty will be revived, so as to entitle the wife to a decree of separation, by subsequent acts of cruelty which of themselves would not have been sufficient to justify a separation.

It seems that subsequent acts of cruelty will not revive condoned adultery so as to entitle the wife to an absolute divorce for the adultery which had been previously forgiven by her.

The time for bringing a suit for a separation from bed and board on account of cruel treatment is not limited to five years. And the court of chancery

in its discretion may allow such a suit to be brought at any time within the ten years limited by the revised statutes for bringing suits in equity.

The court of chancery, upon a decree for a divorce or separation, may allow alimony to the wife to continue during her life although she should outlive her husband; and may decree that the allowance for her alimony shall belong to her as her separate estate, with the right to appoint or dispose of such part thereof as may not be used by her in her lifetime, in case her husband should survive her, by an instrument in the nature of a will.

Whether the court, upon a decree for a divorce, or for a separation, can award a gross sum to the wife for her alimony instead of an annual or periodical allowance; Quære?

Where the husband was admitted to be worth more than half a million of dollars in productive property and had but one relative who had any claim to a provision from his bounty, and where the defendant had treated his wife with great cruelty for many years, she was allowed an annuity of $10,000, to be paid to her quarterly during her life, for permanent alimony, on a decree of separation from bed and board.

THIS was an appeal from a decree of the vice chancellor Oct. 21. of the fourth circuit. The bill was filed by the wife against her husband for a separation from bed and board, on the ground of cruel treatment, and of such conduct on the part of the defendant towards the complainant as rendered it unsafe and improper for her to cohabit with him. It appeared that the parties were married in the spring of 1799, and resided in this state, most of the time at Lansingburgh. They had three children all of whom were dead at the time of the commencement of this suit, in January, 1841. Immediately after the marriage, the defendant caused an injury to his wife, unintentionally as he alleged in his answer, which so far destroyed her health as to render her an invalid forever afterwards. He also, within a year or two after his marriage, commenced a course of unkind, harsh, and tyrannical conduct towards her, which continued with very slight intermissions, until she finally separated from him six years before the commencement of this suit. The proofs also showed that as early as 1812 or 1813, he pulled her chair from under her, threw her upon the hearth and dragged her across the room, in the presence of his servants; and that shortly afterwards she was compelled to fly from his house for fear of injury from his violence. She was afterwards induced to come

back and live with him, on account of her children. But in 1829 or 1830 she was again compelled to flee from his house on account of his personal violence to her ; and she continued separated from him about two months, when she again consented to come back and live with him, upon his promise to treat her better for the future. She finally left him in the spring of 1835, for fear of personal violence and further injury to her health, after two or three days of abusive and inhuman treatment on his part; from which time he made no provision whatever for her support, although it appeared that his property was reputed to amount in value to a million of dollars. It appeared also that ten or twelve years after the marriage the defendant received about $7000 as the distributive share of his wife in her father's estate. After the commencement of the suit an order was made for the allowance of $2000 annually, for *ad interim* alimony, to commence on the 1st of February, 1841. The vice chancellor, upon the pleadings and proofs, decided that the defendant had been guilty of cruel and inhuman treatment of the complainant by repeated acts of violence and cruel conduct, so as to render it unsafe and improper for her to cohabit with him, or to be under his dominion or control. He therefore decreed a separation from bed and board, and allowed her $10,000 a year for alimony, to commence from the date of the decree, payable quarterly during her life, to be secured to her in such manner as one of the masters of the court should approve, with the costs of the suit to be taxed. From this decree both parties appealed to the chancellor ; the defendant from the whole decree, and the complainant as to the amount of alimony.

The following opinion was delivered by the vice chancellor :

WILLARD, V. C. The law of this state restricts the power of the court in granting a separation from bed and board, to applications on the complaint of the wife alone ; and in this respect it is different from the English ecclesiastical law, which grants such a separation to either hus-

band or wife, indiscriminately. The 51st section of article 4th, of separations or limited divorces, describes the causes for which such separations may be decreed. They are, 1st. The cruel and inhuman treatment by the husband of his wife ; 2d. Such conduct on the part of the husband towards his wife, as may render it unsafe and improper for her to cohabit with him ; and 3d. The abandonment of the wife by the husband, and his refusal or neglect to provide for her. These causes are more comprehensive than those for which a similar separation is decreed by the ecclesiastical courts in England. The facts disclosed by the bill and proved by the testimony bring this case within the first or second, and perhaps both the first and second subdivisions above named. A long and uninterrupted succession of acts on the part of the defendant, not merely of rudeness and petulance, but of severe and brutal usage, is shown, painful to contemplate, and in some instances too loathsome to disclose. No one can carefully read the testimony without feeling that the complainant has not been rash in her appeal to the court for redress. She has borne the ill usage of her husband with patience and meekness— she is in no instance shown to have provoked it by her own misconduct. During the whole period of more than thirty-five years that she continued with the defendant, she appears to have acted towards him as a devoted wife. Her treatment of him has been uniformly kind, affectionate and conciliatory, and she is shown to have rendered services to him in respect to dressing him and cleansing his person, which none should require of another unless rendered helpless by age or disease.

The 53d section of the same article permits the defendant in his justification to prove the ill conduct of the complainant—and on establishing such defence, to the satisfaction of the court, the bill shall be dismissed. This is on the principle that the court will not aid the party who has herself occasioned the injury for which she seeks redress. Such defence is analogous to the *compensatio*

*crimenum* of the cannonists. (*Beebe* v. *Beebe*, 1 *Hagg*. 789.)
No such defence is interposed here and none such is proved.

But the counsel for the defendant have urged that the subsequent cohabitation of the parties has amounted to a condonation of all prior offences. They would thus exclude from the consideration of the court every cause for a separation which existed previous to such condonation. In effect, they seek to narrow down the injury to the conduct of the defendant which lead to the final separation of the parties.

This, however, is not a correct view of the doctrine applicable to this class of cases. A condonation is a conditional forgiveness. It implies that the complainant will not put forth the bad conduct which is forgiven, if the defendant shall continue ever afterwards to treat her with conjugal kindness. Hence it follows, that, after an act of personal abuse has been *condoned* by subsequent cohabitation, a repetition of it affords not only a substantive cause of separation, but revives also all those which existed prior to the condonation. (*See D'Aguilar* v. *D'Aguilar*, 1 *Hagg*. 733. *Beebe* v. *Beebe*, 1 *Hagg*. 789.) The cases on this subject in the English books are numerous and are familiar to the profession. Slight acts of abuse, and which of themselves would not sustain the bill, are a breach of this conditional reconciliation, and revive all antecedent acts of cruelty and misconduct.

The counsel have urged also the delay of the complainant in exhibiting her bill as a waiver of all claim to the relief sought. On a bill for a divorce on the ground of adultery the statute requires that the suit shall be brought within five years after the discovery of the offence charged. But there is no such statutory requirement with reference to a separation from bed and board. No doubt in the latter case, a long delay might, in peculiar cases, justify the court in treating the complaint as a stale one and dismissing the bill. (*See Walker* v. *Walker*, 2 *Phil*. 153.) But in the present case, the time from which to compute is the day the complainant left the defendant in 1835. The cause

for which she left was in my judgment sufficient to revive all previous offences of the defendant. (*Durant* v. *Durant*, 1 *Hagg.* 733.) Since that time there has been no condonation. The delay of exhibiting the bill has not been such, even if unexplained, as to impair the complainant's rights. (*See Popkin* v. *Popkin*, *reported in note to Durant* v. *Durant*, 1 *Hagg.* 733.) But there is a satisfactory explanation given for the delay. I think the complainant is entitled to a decree of separation from the bed and board of the defendant forever.

The remaining question is as to the amount of alimony to which the complainant is entitled. The 54th section enacts that upon decreeing a separation, the court may make such further decree for the suitable support and maintenance of the wife, by the husband or out of his property, as may appear just and proper. The 56th section allows a decree for a separation to be revoked on a reconciliation of the parties, under such regulations and restrictions as the court may impose. A decree for a separation, or limited divorce, does not *per se* affect the question of property between the parties. The wife is still entitled to dower in the real estate of which her husband is, or shall thereafter be, seized ; and she can also claim her distributive share of his personal estate in case he dies intestate, in the same manner as if no such decree had been pronounced. The statute has made a difference in this respect, between a limited divorce *a mensa et thoro*, and a divorce *a vinculo matrimonii* for adultery. In the latter case, the wife being the guilty party, forfeits her dower and her right to a share of the personalty under the statute of distributions ; and the husband still retains his marital rights to her real and personal estate, in the same way as if no divorce had been pronounced. If the husband is the guilty party, the wife is allowed, in such case, to hold her real estate, if she have any, discharged of his claim ; as well as her personal estate which has not been already reduced to possession by him. (*See* 2 *R. S.* 145 *and* 142, 1*st ed.*) But I apprehend, after a divorce for adultery, the wife being the com-

plainant, is still entitled to be endowed of the lands of which her husband has been theretofore seized. It is unnecessary, however, to decide or discuss this question, since there is a marked distinction between the consequences which result from a divorce *a vinculo matrimonii*, and a separation merely from bed and board. It is adverted to merely to show that the question of alimony does not necessarily involve the distribution of the husband's estate.

The complainant insists that she is entitled to have a gross sum instead of an annuity, awarded to her by the court. It is supposed that the opinion of the chancellor on the exceptions to the master's report on the subject of *ad interim* alimony, in this very cause, has not left this an open question. The chancellor remarks that on the complainant establishing her bill, the court will be authorized to award to her a very considerable part of the defendant's estate. And he intimates that the title to a third and perhaps to the half of it may be involved in this controversy. If by this the chancellor intended to decide that the court, in a case like the present, would divide the defendant's estate, on the same principle that controls its distribution on the death of the defendant intestate, I apprehend he is not supported by any adjudged case. In *Peckford* v. *Peckford*, (1 *Paige*, 274,) where there had been a divorce for the adultery of the husband, the chancellor allowed the wife, for her alimony, an annuity during her life equal to the interest at six per cent on one third of the sum which it was proved the defendant was worth. In *Lawrence* v. *Lawrence*, (3 *Paige*, 267,) he approves of the same principle, referring to the last mentioned case as an illustration of the rule ; and also to *Cooke* v. *Cooke*, (2 *Phil.* 40.) In the latter case Sir John Nicholl allowed the wife an annuity during life of £450, being one half the income of the husband. In the opinion delivered by Sir John, he adverts to five other causes which had been decided in which a like principle had been applied. He observes that the court always gives a larger proportion when the income is smaller. In the case of *The Countess of Pomfret*, where

the income of the husband was twelve thousand pounds
sterling, or nearly sixty thousand dollars, the court allow-
ed the wife an annuity during life of four thousand pounds
sterling, or nearly twenty thousand dollars. In *Smith* v.
*Smith*, (2 *Phil.* 235,) the court allowed the wife an annui-
ty of a thousand pounds sterling during her life, being one
half the income of the husband. In this case the bulk of
the fortune originally belonged to the wife. Sir John
Nicholl remarks in that case that it would be just, where
the husband violates the matrimonial engagement and the
fortune came from the wife, that the husband should give
the whole of it back to her; but he admits that the courts
have not yet gone that length. Even where the bulk of
the fortune belonged to the husband, the court allows a
competent income to the wife. She is the injured party
and has a strong claim upon the court.

This question came before Chancellor Kent in *Barere* v.
*Barere*, (4 *John. Ch. R.* 187, 197.) After examining the
main question with his usual ability, he consigns the custo-
dy of the child to the mother, and directs the moderate an-
nuity of $200 a year to be paid by the husband to the wife,
for the support of herself and child. He does not speak
of a gross sum being allowed in that or any other case.

I infer from the foregoing cases that the chancellor could
not have meant that the one third or one half the defen-
dant's entire estate should be made over to the complain-
ant in case her bill was established, but merely that the one
half or one third the *income* of it might be thus appropri-
ated, at the discretion of the court. I find no case where
the chancellor, or any other court, has directed a sum in
gross to be paid the wife. There is a looseness of expres-
sion in the marginal note to some of the cases, and in some
of the opinions, which give countenance to the claim set
up by the complainant. But the cases themselves do not
sustain it. I think it has been shown that the claim to a
gross sum is incompatable with some of the provisions of
the statute, where, as in this case, the claim arises out of a
limited divorce. Besides, the terms used in the statute,

*support and maintenance,* are not the phraseology which would be used if the legislature intended an alienation of an estate ; or a transfer in perpetuity to a person, of either real or personal property. The 55th section authorizes the court to make order for the support and maintenance of the wife and children by the husband, even though a decree for a separation be not made. Hence it is inferred that those terms are used in their popular sense.

Again, if the legislature intended, by the section in question, to authorize the court to grant a *sum in gross* to the wife, the power should perhaps only be exercised in that form where there are children of the marriage who continue to reside with and adhere to the wife, and for whom the defendant will not probably make any provision. But there are no children of the marriage now living, in the case before me, and no special reason has been alleged why the court should depart from the usual course in such cases. I shall not, therefore, direct a sum in gross to be paid the complainant.

With respect to the sum which ought to be allowed her as an annuity, there is no fixed rule by which the court should be guided. To restrict her to the sum which has been deemed enough by the defendant to support his own family, would be unjust and niggardly. The sum of money which she brought to him thirty years ago, would, if it had been kept properly invested, at this time produce an annuity of two thousand dollars. It is true, the bulk of the estate belongs to the husband, and has been produced by his industry, prudence and skill. He is shown, I think, to be worth a million of dollars. A portion of it is in real estate, in which, if the complainant survives him, she will be entitled to dower. It is not probable that the defendant can realize from so large an estate a net income equal to a moiety of the interest of the capital. The losses incident to stock operations, as well as failures among other debtors, will occasion a heavy drawback from his monied profits. These things must be regarded in fixing the amount of alimony.

1842.

Burr
v.
Burr.

The early habits and respectability of the complainant must also be considered. She is proved to have been a lady of education and refinement, accustomed to move in the first circles in Connecticut, where she was born and spent the early part of her life. Before her inter-marriage with the defendant, and afterwards, her father's family occupied the highest rank in society, both in regard to wealth and respectability. The prospect of no lady for an honorable and happy settlement in the world could have exceeded hers. Surrounded by whatever can make the female character lovely and attractive, and accustomed to the elegancies of refined society, she had a right to anticipate, from her union with the defendant, a life of usefulness, happiness and honor. But how vain and fallacious have been her hopes! Instead of beholding in the defendant a kind and amiable companion, alleviating her sorrows by his sympathy, and heightening her joys by his participation, she soon found herself a slave to a master, petulant, capricious and cruel. Even the last source of a woman's happiness—the pleasure derived from beholding the opening beauties and excellencies of their common offspring—was embittered with the reflection that they must carry with them to a premature grave, the evidence of their father's profligacy. Her own health too is shewn by the evidence to have been permanently and irretrievably impaired by the loathsome disease which he imparted to her. And thus, instead of occupying a station in society of usefulness and active benevolence—of being a guide and a patron to a numerous circle of relatives and friends—she was compelled to struggle with her own infirmities ; to hear herself constantly addressed in terms of rudeness, profanity and obscenity, by the man who had vowed to love, to cherish and protect her ; and to render those services to his person which cannot be described without an offence to delicacy. This is a mere sketch of the case as it appears in the depositions of the witnesses. And although money cannot compensate for blighted hopes, a broken constitution and a broken heart, it is all the recourse which human

laws have provided for such a case. As a means of punishment to the defendant, who is proved to be in the wrong, and for the sake of public example, it affords a more ample weapon ; especially when applied to one whose money is his god.

In view of all the circumstances of the case, and considering that the complainant will be entitled to dower in the defendant's real estate if she survives him, I shall decree that the defendant pay to the complainant an annuity during her natural life of ten thousand dollars, to commence this day, and to be paid quarterly on the first day of January, April, July and October in each year. The alimony heretofore granted of two thousand dollars a year, will cease at the commencement of that now decreed. And the complainant must recover her costs against the defendant to be taxed.

The defendant must give security for the payment of the annuity, unless the matter is adjusted by the parties. A reference to a master may be had if necessary, to take such security. This may be provided for in the decree.

*Samuel Stevens*, for the complainant. The evidence shows sufficient legal cruelty on the part of the defendant towards the complainant to entitle her to a sentence or decree of separation from bed and board forever. The husband's conduct is legal cruelty, if by cohabitation the wife is exposed to bodily hazard, and intolerable hardship. Words of menace intimating a malignant intention of doing bodily harm is legal cruelty—the court must not wait till threats are carried into execution. (*D'Aguilar* v. *D'Aguilar*, 1 *Haggard*, 773.) The defendant's treatment of his wife was cruel and inhuman within the meaning of the statute, and indeed such as to render it unsafe for her longer to have cohabited with him. (2 *R. S.* 147, § 51. *Id.* 2d ed. 81, § 49.) The wife's delay to file the bill for redress does not even raise a presumption against the truth of the charge. (1 *Haggard*, 773.) The subsequent acts of cruelty destroy or take off the effect of acts on the

part of the complainant, which might otherwise be evidence of condonation. There has therefore been no condonation of the first legal cruelty. (1 *Haggard,* 773.) Acts of cruelty which would not support a bill for separation will take off the effect of condonation, and in such case the first acts of cruelty are to be looked upon the same as if recently committed. (*Ibid.*) In this case justice requires that a sum in gross should be decreed to the complainant for alimony. The court has full power to make such a decree. (2 *R. S.* 747, § 54. *Id.* 2d ed. 81, § 52. 1 *Paige,* 274, 275.)

*D. Buel & J. Pierson,* for the defendant. The return of the complainant to the husband's house and her cohabitation with him subsequently to her departure, is evidence of a condonation of all previous offences; therefore any causes of separation which existed previous to the reconcilements of the parties should not enter into the consideration of the court. The evidence is not sufficient to authorize a decree of separation. If the evidence should be deemed sufficient to authorize a decree of separation, the court, on fixing on an annual sum to be paid for the complainant's support, will have regard to the age of the complainant and the style and manner of living to which she has been accustomed since her marriage—which may be ascertained by the court from the testimony, or by reference to a master. If an annuity be decreed to the complainant, it should not extend beyond the joint lives of the complainant and defendant. The decree should have allowed to the defendant, towards the costs of the suit, the sums he has advanced on the former orders of the court towards the complainant's costs and expenses of the litigation, instead of requiring the whole costs to be again paid.

THE CHANCELLOR. The first question for consideration in this case is whether the complainant has established such a case as to entitle her to a decree of separation. And certainly there cannot be any doubt on that part of

the case, if her cohabitation with her husband after most of the acts of cruelty on his part took place is not an absolute bar to a suit founded upon them. The conduct of the husband was repeatedly such as to raise a well founded apprehension on the part of his wife of such violence as would endanger her health if not her life; and this not merely when he was under the influence of liquor, but also when he was influenced only by his ungoverned temper and most brutal appetites. Indeed, it appears from the whole testimony that this unfortunate lady was, for more than thirty years, subjected to a state of suffering almost beyond human endurance. I allude not to the fact, which is not denied, that her health was permanently destroyed by him immediately after the marriage, and for which a life of kind offices and delicate attentions on his part could scarcely have atoned. But the proof shows that notwithstanding this strong claim upon him to make up to her in kind treatment for her impaired health and bodily sufferings, the result of his former indulgencies as admitted by him, he has treated her more like a menial servant than a wife during nearly the whole time she lived with him. Those who had been acquainted with her before her marriage show that she belonged to a very respectable family in Connecticut; was amiable, talented, and accomplished, and moved in the first circles in the neighborhood of her father's residence. And yet with a fortune more than sufficient for all the comforts and even the ordinary superfluities of life, her husband, for a third of a century, subjected her to the most degrading and sometimes the most disgusting services, many of which were rendered necessary by his own vicious indulgences. He habitually used towards her harsh, ungentlemanly, profane, and opprobrious language—cursing her whenever he got angry either with her or any one else—calling her " a dirty bitch," and following her from room to room whenever she attempted silently to escape from the effects of his anger, or the indulgence of his more than brutal passions; and this too in the presence of his servants and family. And on several

1842.

Burr
v.
Burr.

occasions he resorted to personal violence amounting to such legal cruelty as would justify the court in decreeing a separation ; connected as those acts of violence were with a general course of unkind treatment. On one occasion it appears that for no other cause of offence than that a servant had, by accident, dropped the head of a fish upon the floor, he immediately commenced abusing his wife for it—cursing her and applying to her his common ungentlemanly epithet; and he finally thrust his fist under her nose and pushed her head back in anger, although she had immediately expressed her regret that the accident had occurred. At another time he pulled her chair from under her, threw her upon the hearth, and dragged her across the room in the presence of his servants in the kitchen, under circumstances which showed an utter disregard of her health if not of her life. Sometimes he has deprived her of the use of a fire in her room when she was sick ; and at others he has thrown open the windows and doors of her room to compel her to leave her bed, when she was in the same situation, to the manifest danger of her health. She also alleges in her bill that he occasionally resorted to blows when no witnesses were present ; which charges are not specifically denied in the answer, which is put in without oath, although there is in the concluding paragraph of the answer a general traverse of all unlawful acts and all other matters charged in the bill. And the facts testified to by the witnesses in relation to his conduct on other occasions leaves very little room to doubt that these acts of cruelty also occurred as charged. Conduct infinitely less aggravated than this was, in the case of *Lockwood* v. *Lockwood*, (2 *Curteis' Eccl. Rep.* 281,) considered by Dr. Lushington, Dean of the Arches, as sufficient to justify a decree of separation.

The circumstances which occurred at the time of the final separation, and shortly previous to that event, and the causes of the defendant's violence at that time, as well as at the previous separation in 1813, are too degrading to human nature to admit of a particular detail. The defen-

dant's counsel insist, however, that his conduct in 1835, improper and indecent as it evidently was, did not amount to such legal cruelty as would of itself justify a decree of separation ; and that all his previous acts of violence and misconduct were absolutely condoned by the subsequent cohabitation of the parties, and cannot now be revived and connected with his subsequent acts to entitle the complainant to the relief asked for by her bill.

The law appears to be well settled in the English ecclesiastical courts that condonation of adultery, as well as of acts of cruelty, is a conditional forgiveness only. And that there is an implied condition annexed that the injury shall not be repeated, and that the other party shall be treated thereafter with conjugal kindness. (*Durant* v. *Durant*, 1 *Hagg. Eccl. Rep.* 761. *D'Aigular* v. *D'Aigular, Idem.* 781.) It was decided by Dr. Bettisworth, the Dean of the Arches, more than a hundred years since, in the case of *Worsley* v. *Worsley*, (2 *Lee's Eccl. Cas.* 572,) that subsequent acts of cruelty after a reconciliation had taken place between the parties, would not only revive condoned cruelty but also the adultery of the party which had previously been forgiven. And the learned Dr. Lushington, in the recent case of *Bramwell* v. *Bramwell*, which came before him in the consistory court of Rochester in 1831, (3 *Hagg. Eccl. Rep.* 635,) held that less cruelty was necessary to revive condoned adultery than to found an original suit for separation. In England the consequences of the establishment of adultery are the same as the proofs of other acts on the part of the defendant amounting to such legal cruelty as will justify a decree of separation from bed and board ; as that is the extent of the sentence which the court is authorized to pronounce, even in a case of admitted adultery. Hence there seems to be no good reason why the offence of adultery should not be revived by the commission of other acts inconsistent with matrimonial duty. Under the statute of this state, however, the consequence of the proof of an act of adultery is an absolute divorce of the injured party from the bonds of matrimony.

And for that reason this court, in the case of *Johnson* v. *Johnson*, (4 *Paige's Rep.* 460,) held that subsequent acts of cruelty were not sufficient to revive condoned adultery, so as to sustain a decree for a dissolution of the marriage contract without proof of fresh acts of adultery. Although the decree in that case was reversed by the court for the correction of errors, yet as one of the senators whose vote changed the result, put his decision upon the ground that the condonation had not been satisfactorily established, the question still remains an open one here. (14 *Wend. Rep.* 648 *n.* *See also Danish Code of Christ.* 5, *B.* 3, *ch.* 16, *art.* 5, § 1.) I have no doubt, however, that the principles of the English decisions apply with full force to suits in this state for separation from bed and board for cruel treatment. And according to these principles former injuries will be revived by subsequent misconduct of a slighter nature than would have been necessary to constitute an original cruelty entitling the injured party to a decree of separation. Such was the decision of Sir John Nicholl in the case of *The Marquis & Marchioness of Westmeath*, (2 *Hagg. Eccl. Rep. Supp.* 114.) And that decision was afterwards affirmed by the high court of delegates; and the lord chancellor subsequently rejected an application of the Marquis for a commission of review. Indeed in most cases of this kind the legal cruelty which will form a sufficient ground to justify a decree of separation, consists in a continued series of acts of ill treatment; and relief could seldom be obtained in any case by an injured wife, if her continued cohabitation, and very laudable efforts to obtain better treatment from her husband for the future, should be held to constitute an absolute bar to her right to connect his last ill treatment with his previous acts of violence and cruelty. Independent of this principle of reviving condoned cruelty, however, I think the testimony of Doctor Leonard and others, show that at the time when the complainant last fled from her husband's house, she had good cause to fear serious injury to her health from his worse than brutal conduct.

The objection that the suit in this case was not commenced for some years after she left his house, is sufficiently answered by the fact, that her only surviving child was then living under the protection of his father, and that during his life she was unwilling to involve him in these family difficulties, by the institution of a suit against her husband for a final separation. In the case of *Best* v. *Best*, (2 *Phill. Eccl. Rep.* 161,) the suit was not instituted until five years after the wife left her husband and went to reside with her paramour ; and yet the simple affidavit of the husband was received to excuse his delay in instituting his proceedings for a divorce. And in *Coode* v. *Coode* (1 *Curteis' Eccl. Rep.* 755,) a delay of six years in the bringing of the suit was considered as sufficiently accounted for by proof that a suit was commenced soon after the injury occurred, which suit was soon after abandoned for want of sufficient means to carry it on ; although the complainant in that case was in the receipt of his half pay as a naval officer. (*See also D'Aiguilar* v. *Aiguilar*, 1 *Hagg. Eccl. Rep.* 780.) The legislature having fixed a specific limitation, of five years after the discovery of the injury, in suits for divorce on the ground of adultery, and said nothing as to the time of bringing suits for separation on the ground of cruelty, it is to be presumed that they intended to leave the latter class of cases to the discretion of the court, and to the general limitation as to suits in equity not otherwise provided for, as prescribed by the 52d section of the article of the revised statutes relative to the time of commencing suits in courts of equity. (2 *R. S.* 302.)

The fact that the defendant has abandoned his habits of intemperance since the separation, affords no sufficient grounds for denying the relief sought by the complainant's bill. For the testimony of nearly every witness who had any means of knowledge on the subject, concurs in showing that the defendant's abuse of his wife was not limited to those seasons when he was laboring under the effects of intoxication ; but that his conduct to her was generally unkind and inhuman, whether he was drunk or sober.

The objection that the decree should have allowed to the defendant, towards the costs of the suit, the sums he had already advanced under the former orders of the court, cannot be sustained ; as there was nothing before the vice chancellor to show that any such orders had been made. Besides, the extra expenses and reasonable counsel fees in this case must probably have exceeded the sums paid ; even if papers had been produced on the hearing in the court below showing what orders had been made and what sums had been paid by the defendant on that account. And the objection that the vice chancellor was not authorized to decree a provision for the alimony of the wife which should continue beyond the life of the husband, is clearly untenable. The statute authorizes the court to make such order and decree for the suitable support and maintenance of the wife out of his property as may be just and proper. (2 R. S. 147 § 53.) And it certainly cannot be unjust or improper to compel a husband, whose wife has been driven from her home by his cruelty or in consequence of his defilement of the marriage bed, to provide her a suitable support for the remainder of her life ; instead of permitting him to dispose of his property to strangers, at his death, leaving her entirely destitute.

Whether the court, in such cases, is authorized to award a gross sum to the wife, instead of an annual allowance, it is not necessary in this case to consider. For it will be more beneficial to the complainant to have a liberal quarterly allowance, for life, than any gross sum which the court would think it proper to give ; and which gross sum, in case of her death in the lifetime of the husband, might belong to him under the statute of distributions. (2 R. S. 98, § 79.) In making the provision for an annual allowance in this case, however, the decree should have directed that the annuity, if not paid quarterly, as it becomes due, should still belong to the wife as her separate property ; and with power to her to dispose of it as she pleases at her death, by an instrument in the nature of a will, if her husband survives her. So that he would have no inducement to withhold the payment

1842.

Burr
v.
Burr.

in anticipation of her decease; or to delay her just claims by a protracted litigation in the higher courts until death should have closed the sufferings of the victim of his unparalleled cruelty and restored the allowance for her alimony to his already overgrown estate.   And I think the allowance for alimony should have been directed to commence from the time of filing the complainant's bill on the 12th of January, 1841 ; deducting therefrom the *ad interim* alimony which has been received by her or her solicitor for her use..  If the parties cannot agree upon the manner in which the allowance for alimony shall be secured to her, it must be secured to the New-York Life Insurance and Trust Company, as her trustee, for her separate use ; with power to her to dispose of it by will or otherwise, either during her life or at her death, as she may think proper.   The amount of the allowance up to the 12th of October instant, with interest on the arrears previous to the date of the original decree to be computed from that time, and on the residue from the respective quarter days thereafter, is to be paid immediately.   And the subsequent allowance must be paid quarterly from the 12th of October instant ; and, if not paid at the times when the quarterly payments respectively become due, the interest must be paid thereon from those times.

The amount which the vice chancellor has allowed for permanent alimony, although apparently large, is not too much when all the circumstances of this case are taken into consideration. . The husband's property is estimated at a million of dollars by some of the witnesses, and is conceded by his counsel to be at least half of that amount. His annual income, therefore, must be from thirty to sixty thousand dollars.   And no one has any claims upon his bounty but his unfortunate son by a former marriage, whom he has abandoned.   If a few years of affluence can, to any extent, compensate this complainant for more than thirty years of unexampled sufferings and misery, either by the gratification of her feelings in the remuneration of those who have harbored and supported her in adversity,

or in securing to her those indulgencies which her health requires, it cannot be an improper exercise of the discretion of this court to give to her a most liberal allowance for permanent alimony. In *Mytton* v. *Mytton*, (3 *Hagg. Eccl. Rep.* 658,) Sir John Nicholl allowed £1000 sterling per annum, out of an income of £6000 which was subject to a considerable incumbrance for debts. In *Smith* v. *Smith*, (2 *Phil. Rep.* 237,) where the whole income was £2000, one half thereof was awarded to the wife. And in the case of *The Earl of Pomfret*, decided in the Arches court of Canterbury in 1796, the wife was allowed one third of the income, or £4000 sterling—nearly double the amount of the allowance in this case—although the husband was a peer of the realm and required a large income to support that dignity. (*See* 2 *Phil. Rep.* 43, 110 *and* 236.) If ever a case called for an extraordinary allowance, this certainly is one ; for I think it is without a parallel in this or any other country. And here I cannot forbear to remark upon one extraordinary feature of it. It appears from the evidence that during her thirty years of suffering the complainant uniformly treated her husband with kindness, and did every thing in her power to please him, seldom, if ever, saying any thing in reply to his abuse. And she frequently entreated his servants not to mention his brutal conduct towards her out of the family.

With the modifications above suggested, the decree of the vice chancellor must be affirmed ; and the defendant must pay to the complainant, or her solicitor, or next friend, the costs upon these appeals to be taxed.(*a*)

---

(*a*) Affirmed by court for the correction of errors, upon appeal to that court, in December 1843.