Wright, J.
This controversy, as like cases are apt to-be, has been bitter and protracted. Twelve years since the wife brought her action against the husband for a divorce on the ground of adultery; and for over eleven years she has had the verdict of a jury convicting.him of the offence, and the judgment of the court dissolving the marriage. During this latter period the controversy has been principally in respect to alimony, a mere incident of the judgment. For more than ten years the plaintiff has been divorced from the defendant, and at liberty to marry again; yet we are now called upon to review the judgment of divorce, and if a merely technical error shall be discovered in the protracted trial of the issues of adultery of the defendant or plaintiff, to reverse such judgment. Six years had elapsed from the affirmation of the judgment by the general term of the Superior Court, before this appeal was brought; and as the judgment for a divorce was a final and perfect one, and the “ further decree or order” for alimony, not any part of it, or a necessary consequence of such judgment, but resting in the discretion of the court, and the judgment not having been appealed from within two years, we should probably have dismissed the appeal a term or two since when a motion to dismiss it was made, had the law regulating appeals to this court been the same as originally enacted in the Code. .In 1857, however, the provision in respect to appeals was so amended as to authorize an appeal to be taken “ within two years after the judgment shall be perfected, by filing the roll thereof, and entering the same in the judgment book, in the proper clerk’s office ” (Ch. 723, of 1857, § 18), and in 1858, it was still further amended so as to allow an appeal to be taken “ within two years after the judgment shall be perfected by filing the judgment roll.” (Ch. 306, of 1858, § 14.) The judgment roll in this case was not filed, as would seem until March, 1862, and the defendant had two years from the latter date within which to appeal, and before a review in *506 this court could be barred. By section 331 of the Code of 1851, the appeal must have been taken two years after the rendition of the judgment; but by subsequent amendments of the section it was allowed to be taken within two- years after “ the judgment shall he perfected by filing the judgment roll.” We are of the opinion, therefore, that a review in this court of the judgment affirmed at the general term in January, 1856, is not barred by the statute.
A preliminary point made by the defendant is, that the Superior Court had not jurisdiction of the action. This point was first raised on appeal to the general term, but if well taken .is available at any stage of the suit. It proceeds on the ground that the legislature was incompetent to confer, and, in fact, has not conferred, jurisdiction in divorce cases on the Superior Court. I think the ground is not maintainable. During our colonial existence, and for more than ten years after the colony became a state, there was no authority in any court of this state to grant a divorce. In 1787,'the legislature conferred authoritv upon the Court of Chancery to grant divorces in cases of adultery. This continued to be the only law until the revision of 1813, when the legislature made a new and extensive provision for divorces, and widening the jurisdiction of the Court of Chancery.
It was competent for the legislature to have conferred the jurisdiction upon an existing court or to have created one having powers as to divorce cases similar to the ecclesiastical courts of England. The Constitution of 1821 imposed no restriction on the power of the legislature in this respect. In the Revised Statutes, while continuing the authority in the Court of Chancery on matters of divorce, the legislature adopted a system in many respects new, and more comprehensive, and to some extent regulating the practice in that class of cases. The tendency of legislation from the beginning was to invest the court of equity with an authority over a subject that in England belonged exclusively to the spiritual courts and to Parliament. Thus the law continued until 1846, when the Constitution abolished the Court of Chancery, and *507 provided for a Supreme Court having general jurisdiction in laws and equity. The same power was given to the legislature “to alter and regulate the jurisdiction, and proceedings in law and equity as they have heretofore possessed.” (Const., art. 6, § 6.) -By the judiciary act of 1847, the Supreme Court was vested with the same powers, and authorized to exercise the same jurisdiction as was then possessed and exercised by the Court of Chancery. (Ch. 280 of 1847, § 16.) The Constitution of 1846 had provided expressly for the establishment by the legislature of inferior local courts of civil and criminal jurisdiction in cities, (Const., art. 6, § 14,) and that the Superior Court of the city of Mew York should remain until otherwise directed by the legislature, with its then powers and jurisdiction. (Const., art. 14, § 12.) In 1848 the legislature abolished the distinction between actions at law and suits in equity, and the forms of all such actions and suits theretofore existing, and enacted that there should be in this State thereafter but one form of action for the' enforcement or protection of- private rights and the redress or prevention of private wrongs, which should be denominated a, civil action. (Code of 1848, § 62.) Remedies in courts of justice were divided into actions and special proceedings, and an action was defined to be an ordinary proceeding in a court of justice by which a party prosecutes another party for the enforcement of a right, the redress or prevention of a wrong, or the punishment of a public offence. (Code of 1849, § 22.) The Code prescribed a uniform mode for the commencement of the action, viz.: by summons and complaint; and as indicative of the intention of the legislature to embrace within the definition of án action under the Code, one for a divorce, the amended Code of 1851, expressly provided for the service of the summons by publication when the defendant could not, after due diligence, be found within the State, “ where the action was for divorce in the cases prescribed by law.” (Code of 1851, § 135, sub. 5.) The Code provides that the jurisdiction of the Superior Court Shall extend to the actions enumerated in sections 123 and 124 (when the causes of action are local or against public officers) *508 and to all other actions where all of the defendants shall reside or are personally served with the summons within the city of New York. (Code of 1849, § 33.) This language is comprehensive enough to embrace an action for a divorce against a person resident and served with summons in the city of New York. The defendant resided and was served with the summons within that city.
By no proper construction óf the Constitution of 1846, can it be deemed to have vested in the- Supreme Court, as successor of the Court of Chancery, the whole jurisdiction as to divorce cases, without any authority in the legislature to confer it on any other tribunal. The legislature was without doubt competent to vest such jurisdiction in the Superior Court, and if the proceeding to obtain a divorce is an action within the meaning of that word, as used in the Code (and this admits of no, question) then it has exercised the power in a case where the defendant resides or is personally served with the summons within the city of New York. The jurisdiction of the Supreme Court is not taken away or interfered with in this class of actions, but the legislature has chosen to confer a limited concurrent jurisdiction-on the Superior Court.
The complaint charged the defendant with having committed adultery with persons' named, and also at specified times and places with persons whose names were unknown to the plaintiff. The defendant by his answer, scarcely put his guilt in issue. He denied that he committed adultery with any or either of the women mentioned and referred to in said complaint, at any or either of the times and places stated in said complaint.” This is hardly more than putting in issue the act of the commission of.adultery at the times and .places stated. The burden of 'the answer consisted in recriminatory charges of adultery of the plaintiff in defence and bar of the action. In December, 1850, the issues as to the adultery of the defendant and also of the plaintiff were ordered by the court to be tried by a jury. Subsequently, and before the trial was had, the Code was amended by directing that an issue of fact in an action for a divorce from the marriage contract *509 on the ground of adultery should be tried by a jury. (Code of 1851, § 252.) In December, 1851, a jury was impanneled before the late Chief Justice Oaklet to try the issues of fact, and after a trial which occupied six weeks, a verdict was ren dered against the defendant on all the issues. The jury found that the defendant had committed' adultery as charged in the complaint, and that the recriminatory charges against the plaintiff were not sustained. The large volume furnished to us and to the general term of the Superior Court contains all the evidence taken, and á full history of.the proceedings on the trial of the issuesand the case cannot .be read without admiration of the ability and rigid impartiality of the presiding judge. If there was anything in the conduct of the trial to be censured it was. the latitude extended to the defendant in his recriminatory effort. The greater part of a trial, unusually and unnecessarily protracted, was consumed, not in an effort to maintain or .establish the innocence of the defendant, but in an attempted recrimination of the plaintiff. Of the numerous exceptions "taken by the defendant to the decisions of the judge in admitting or rejecting evidencé, but three (only one of which is now insisted on) were to proof bearing on the question of the defendant’s guilt, whilst most of the others were to evidence elicited, or sought to be elicited, to establish or overthrow the defence of recrimination. ■
The result of the trial of the issues, as has been said, was a conviction of the defendant and an exculpation of the plaintiff from the charge of adultery. The defendant did not complain that the verdict of the jury was unsupported by the evidence, or ask for a new trial on the merits; but contented himself with appealing from the judgment for a divorce subsequently rendered at special term, and asking a reversal thereof, exclusively on the ground of alleged errors of the judge in admitting and rejecting evidence on the trial of the issues of' fact, and of the court in the award of alimony.
It was insisted that the same principles upon which a court of law formerly proceeded in granting or refusing a new trial should be applied to the case; and if evidence had been rejected *510 on the trial of the issues that ought to have been received, or evidence received that should have been rejected, the defendant was entitled to a new trial. This is hardly the rule now in a court of law, for, latterly, even these courts undertake to judge for themselves of the materiality of evidence found to have been improperly admitted or rejected; and when satisfied that no injustice has been done, and that the verdict would have been the same with or without such evidence, they have refused a new trial.' (Doe v. Tyler, 6 Bing., 561.) Courts of equity have, however, been governed by very different principles from those of a court of law, in granting or refusing new trials of issues of fact. Though evidence had been improperly admitted or rejected, if a court of equity was satisfied that the verdict .ought not to have been different, it would not grant a new trial merely on such ground. (Barker v. Ray, 2 Russ., 63; Lyles v. Lyles, 1 Hill’s S. C. Eq., 82.) The object of a feigned issue is to satisfy the mind of the equity judge upon matters of fact; and the object is attained when the conscience of the judge is satisfied that, at the trial, justice has been substantially done. (Mulock v. Mulock, 1 Edw. Ch., 14; Apthorp v. Comstock, 2 Paige, 483; Collins v. Hare, 1 Dow [N. S.], 139; S. C, Bligh [N. S.], 106; Booth v. Blundell, 19 Ves., 503; Savage v. Carroll, 2 Ball & B., 444.) The application for a new trial is in the discretion of the equity judge; and upon principles well settled before the Code, and I think not altered thereby, á new trial jvould not be awarded in actions of divorce, unless for substantial errors, showing that a fair trial was not had, and affording reasonable doubt as to the justice of the' result. The law of divorce would be useless to the innocent party, and destructive to the public, if new trials were granted upon slight or sharp exceptions.that astute counsel may take in the progress of a protracted investigation of matters of fact, and which might sometimes avail in ordinary suits concerning property or for damages. The inquiry in a court of equity is, is there enough upon the whole case to show that the verdict of the jury is substantially right. This doctrine is especially applicable when the defendant’s guilt satisfactorily appears, *511 and a new trial is asked of recriminatory charges, merely on the ground that some irrelevant testimony was admitted, or some of slight relevancy was rejected. It was in the light of these well-settled principles that the special or general term of the Superior Court were to examine the alleged errors on the trial of the issues of fact. If the errors were so substantial as to lead to the conclusion that the trial had been an unfair one, or that injustice had been done, the court below should have awarded a new trial, for the discretion with which it was clothed was not an arbitrary one; and if the errors committed plainly led to injurious and unjust effects, of which the defendant had a right to complain, and there was reasonable doubt of the justice of the result, a re-trial of the issues should have been ordered. Of the twenty-five exceptions to the rulings of the judge in admitting or rejecting evidence, argued in the Superior Court (twenty of which are now insisted on), none were, in the view of that court, tenable, or called for a new trial, even tested by the principles on which a court of law proceeds in granting new trials. They were, to say the least, technical; and if the judge erred in any of the rulings complained of, such error, in my judgment (and so the court below had the right to conclude), was .not of a character to unjustly affect the general result. Look for a moment at the errors now insisted on.
[The learned judge here examined, seriatim, the several decisions of the court insisted on in the points of the defendant’s counsel, as erroneous. This elaborate examination is omitted, as all the judges concurred in the opinion that the trial was to be reviewed, not as upon a strict bill of exceptions, but upon the principles on which a court of equity examined the trial of a feigned issue awarded for the information of its own conscience. His conclusions were, that, tested by the strict rules which a court of law would apply in considering the objections, there were but two or three that were tenable, and these were unimportant as affecting the general result.]
These are all the rulings of the judge on the trial of the issues of fact urged as errors by the defendant’s counsel in his *512 argument at bar. Tested by the principles which govern a court of law in granting new trials, and treating the case made as a pure bill of exceptions taken on a trial in an action at law, I am of the opinion, with the Superior Court, that there were no material errors in the admission or rejection of evidence that should lead to a reversal of the judgment. But this was not the way that mere errors alleged to have been committed on the trial of a feigned issue out o,f chancery were formerly treated and considered, and the Code has introduced no new rule on the subject. If the court below had found on the record exceptions apparently well taken, it was not necessarily required to grant a new trial. The' application for a new trial was to the discretion of the court, and the errors should have been of such a character as to have produced injustice in the general result, to have called for a re-trial. If the court was satisfied upon the whole case, that justice had been done, though there were errors, technical and unimportant to the general result, appearing on the record, it was no abuse of the discretion with which it was clothed to refuse the application of the defendant to re-open the controversy. It seems to me very clear that none of the rulings of the judge complained of had the unjust effect of preventing a fair trial, or of producing injury to the defendant. The general term of the Superior Court affirmed so much of the judgment as dissolved the marriage contract, and awarded costs against the defendant. In the view we take of the case this was right.
There is an incidental branch of this controversy that has elicited much feeling and occupied a large share of the attention of the courts. ' The statute provides, that if a wife is the complainant and a decree dissolving the marriage on the' ground of adultery be pronounced, the court may make a further decree or order against the defendant compelling him “ to provide such suitable allowance to the complainant for her support, as the court shall deem just, having regard to the circumstances of the parties respectively.” (2 R. S., 145, § 45.) On the trial of the issues of fact the question was put to the jury, what annual amount of alimony ought to be allowed to *513 the plaintiff, and the jury answered three thousand dollars. It was for the court to fix the amount of alimony, and the jury had no control over the question. This was discovered when judgment came to be pronounced on the return of the verdict of the jury; and after giving judgment dissolving the marriage, the court proceeded “ upon consideration of the facts admitted by the defendant in the pleadings,” to determine that an allowance of three thousand dollars a year for the support of the plaintiff was just, having regard to the circumstances of the parties respectively, and made a “ further decree or order,” that the defendant pay to the plaintiff the sum of three thousand dollars a year from the commencement of the action. The only facts admitted by the defendant in the pleadings bearing on the question of alimony, were that the value of'his real and personal property did not exceed one hundred and fifty thousand .dollars, and that his clear income from such property was not above four thousand dollars. Upon these facts alone, it is obvious that the court was not prepared to make a j ust disposition of the question of what would be a suitable allowance' 'to the plaintiff for her support, having regard to the statutory requirement. The usual course of the late Court of Chancery in such cases was to order a reference to ascertain, by the report of a master, the value of the defendant’s property, the circumstances of the parties respectively, and what would be a suitable allowance. Such reference should have been ordered at the special term, and the general term, on appeal, so properly considered it, and modified the judgment of the special term by affirming that part of it dissolving the marriage and awarding costs against the defendant, and reversing so much of it as related to alimony, and ordering a reference to take proof, and ascertain and report to the court what would be a suitable allowance. It is made a point by the defendant’s counsel that the general term had no power to order the reference. I think it had. The judgment or order as provided for by statute, directing the payment of permanent alimony, consequential upon the granting of the divorce, was before it on appeal, and it was entirely competent for the ap *514 pellate branch of the court, in reversing the order as to alimony, and thus modifying the whole judgment in the action, to make such direction or order as should have been made by the special term, in the first instance. I entertain no doubt of the power of the appellate branch of the court to make the order of reference. . If it were an irregularity it was merely formal, and was waived by the defendant’s express assent to proceed under the order of the general term when the plaintiff sought a special term order of reference.
The reference was ordered in July, 1856, at which time the ' plaintiff was on her way from California to Australia, and she did not - return to this State until December, 1858. Proceedings on the reference were commenced in May, 1859, and were continued until December of that year. In December, 1859, the referee filed his report and finding of facts, together with the testimony taken before him; and in May, 1860, the special term made an order that the defendant pay to the plaintiff four thousand dollars a year for her support from the commencement of the action, deducting therefrom the sum of $2,150, paid for alimony pendente lite. On appeal to the general term, the order was affirmed.
With respect to this order, the only questions before the court were, 1st, What, amount would be a suitable allowance, having regard to the circumstances of the parties respectively; and, 2d, From what date should the allowance commence. Both the amount to be allowed, and when the allowance was to commence, were matters in the discretion of the court. The statute empowers the court to compel the defendant to provide such suitable allowance as it' shall deem just. Of course, the discretion to be exercised is a judicial, and not an arbitrary one. Ho reference would have been necessary in'the case, if, at the time the judgment of divorce was pronounced, the court had been possessed of facts to enable it to reach a just conclu-. sion as to permanent alimony. The object of the reference, and the repor-t of the referee, is to inform the'conscience of the court; but it is the court, and not the referee, who adjudges the question as to what is a suitable allowance. Hence, there *515 can be no available exception, to be reviewed by an appellate tribunal, either to the report of the referee or to his admission or rejection of evidence on the hearing before him. There certainly cannot be to his rejecting evidence offered by the defendant to prove the immoral conduct of the wife subsequent to the judgment of divorce, on a reference to take proof as to “the circumstances of the parties respectively.” The court itself might, possibly, in the exercise of its discretion, either by reference or when the motion for alimony was brought to a final hearing, hear evidence as to the moral conduct and habits of the wife subsequent to the divorce; but if this be not done, all that can be said is, that, in determining what is a reasonable and just allowance for her support, such subsequent conduct has not been taken into consideration. If, in not doing so, the discretion to be exercised by the court has been abused, it is the subject of appeal; but there can be no abuse of judicial discretion, or any subject for appeal, in not allowing a husband) divorced from his wife, to be the moving party in a proceeding to inquire into her moral conduct subsequently to such divorce.
The power which the statute confers is to make such allowance as the court shall deem just, having regard to the circumstances of the parties, that is, the amount and income of the husband’s estate, and the other duties and burdens chargeable upon him, and the rank and condition in life of the wife.. On a divorce for adultery, the considerations governing the amount of alimony are essentially of a pecuniary nature. If the defendant have the ability to pay, the injured party is to recover such an allowance as will correspond with her social position, and at least maintain her in the style and condition that her husband’s fortune would have reasonably justified her maintenance but for his infidelity. She is not to be put on a stinted allowance because the husband has been unfaithful to his marriage vows ; but this is rather a reason, if his estate be ample, that she should-receive a generous and liberal support. The law allots no definite proportion of the husband’s estate lor alimony; but leaves to the court to award such sum as in the discreet exercise of the power, and having regard to the *516 circumstances of the parties, shall be deemed just. As no two cases are alike, what would be just in one might be unjust in another. Where the husband is possessed of a large estate, and has no children or relatives dependent on his bounty and the wife occupies a high social position, and is a lady of refined and intellectual tastes, it would be just to award such a sum as would be ample to maintain her in the state to which she has been accustomed, though such sum was one-third or even one-half of his income. On the other hand where the estate of the husband is limited, and he has duties or burdens chargeable upon him, and the wife’s condition and station in life is comparatively humble, it would not accord with a just sense, nor would there be a fitness and propriety in it, to strip the husband of the bulk of his property, and bestow it on the wife. On adjusting the allowance, where there has been a divorce for adultery, as it is an act of judicial discretion, the court may take into account imputations against the wife, and even her moral delinquencies after judgment has passed in her favor, but under the statute, &»?d in harmony with the course of judicial decision, the main and legitimate subjects of inquiry are the proper measure of the wife’s expenditures, the amount and 'income of the husband’s estate, and other duties or burdens chargeable upon him. The relevant inquiry at this stage is as to the defendant’s. “ faculties ” and the plaintiff’s need. (2 Bright on Marriage and Divorce, 358, §§ 9, 17 ; 2 Barb. Ch. Pr., 266, n. g; Shelford on Marriage and Divorce, 588, 596; Poynter on Marriage and Divorce, 248, 249, 255, and cases cited in notes; Robotham v. Robotham, 1 Swezey and Tristam, 192.)
The court deemed four thousand dollars a year to be a just allowance for the plaintiff’s support. This appears to be a large sum, but perhaps it is not, taking into view the circumstances of the parties. The value of the defendant’s estate is admitted by himself to exceed $260,000; and there is reason to believe that it is much more, as during six years next after the judgment of divorce, his professional receipts from one theatre alone amounted to about $14,000 per annum, and the *517 proceeds of his engagements at other theatres must have been, large. He was a distinguished and popular dramatic actor and his ability in his profession has been appreciated and generously rewarded. If would not be a high estimate upon the value of his estate to place it at $300,000. The parties have no issue; but the defendant has three maiden sisters whom he supports, and who now preside over his costly mansion in Philadelphia. The plaintiff, is a lady of education and refinement, and previous to this unhappy controversy, and indeed since, has been accustomed to move in the higher social and literary circles of Hew York. Judging from what appears in the case, she is a woman of remarkable energy and intellectual power. She was married to the defendant in 1837, when but nineteen years old, and he, though rising in his profession, had but a small estate. For some twelve years his domestic establishment was under her immediate charge, and she conducted it with system, economy and with a due regard to her -husband’s pecuniary interests, insomuch that when, as we áre now to assume, without cause he banished her from his home and association, his estate had increased from about $12,000 to at ksast $150,000. The parties bad always resided in a city, and do now, where- a larger sum is required for support than in the country. In the case of Burr v. Burr (10 Paige, 20; S. C. in error, 7 Hill, 207), which was for a separation from bed and board for cruel and inhuman treatment of the wife, the Chancellor awarded $10,000 a year as alimony, to begin from the filing of the bill, and the Court for the Correction of Errors affirmed the order. There the complainant was an' aged ladjq xwho, though always occupying a respectable station in life, resided in the country. The defendant’s estate exceeded half a million of dollars, and it is apparent that the amount of alimony was largely exaggerated by a consideration of his cruelty and inhumanity. It may be that because too great consideration was given to these circumstances, the case is an unsafe precedent to follow. It settles, however, the question that the conduct of the. husband may be looked at in adjusting the amount of alimony, and that in.the view of the court *518 of last resort, under the circumstances of that case, there had not been such an indiscreet exercise of power as to be the subject of an appeal. On a division, but five of the members of the court voted for a reversal of the Chancellor’s decree, one of whom was for reducing the amount of the allowance to $3,000 and another to $6,000. In the present case, the husband banished, the wife from his house,' and ceased to cherish and protect her, in May, 1849, and as the subsequent investigation showed, without cause and with imputations against her unfounded in fact. He paid an annual stipend of $1,500 for her support but discontinued that in ¡November, 1850, and left her to support herself, or rely on the favor of strangers.
In view of circumstances developed in the case, the defendant’s wealth and the plaintiff’s need (though we might consider the allowance somewhat large), we cannot say that the discretion of the court below in fixing the sum was so arbitrarily exercised as to amount to an abuse of judicial discretion. If not, there is no question of law raised to be reviewed in this court.
The court awarded alimony from the commencement of the action, instead of the date of the judgment of divorce. This, as was said by Chief Justice Nelson, in Burr v. Burr (supra), is a matter of discretion depending upon the special circumstances of the case. In the case cited the allowance was made to commence from the filing of the bill, though $2,000 a year had been allowed for temporary alimony during the progress of the suit. In this case, it would make about $4,000 difference whether alimony was allowed from the commencement/ of the action or from the date of the judgment of divorce, the action having been commenced in November, 1850, and the judgment pronounced in «January, 1852. It seems to me that if it were ever justifiable or a fit exercise of judicial discretion to date the allowance from the commencement of the suit, it was in this case. The plaintiff had been cast out upon the world, and left to the favor of friends, for the means of support, and to prosecute her suit. Even the stipend that had *519 been allotted to her for support was discontinued before the action was commenced. Before the judgment of divorce no temporary alimony was applied for or allowed, although the expenses of prosecuting the action, beyond the taxable costs, from the protracted nature of the litigation, must have been large. The defendant appealed from the judgment when the cause was hung up in the Superior Court for over four years, evidently because the plaintiff was without means to employ counsel. To dbtain means for her support she was driven to the profession of an actress and theatrical- manager, and pursued it in California and Australia, returning to this State in the winter of 1858. In the meanwhile, and in July, 1856, her cause had been decided by the appellate branch of the Superior Court, but the question of alimony was not definitely disposed of. So much of the judgment as awarded alimony was reversed, and a reference ordered to take proof; and ascertain-and report to the court what would be a suitable allowance to the plaintiff, unless the defendant should,-within ten days from the entry of the judgment, without prejudice to any other objection or exception on his part, file a certificate in writing waiving all further inquiry touching the amount of alimony, or the time from which it should be allowed. An opportunity was here presented for the defendant to waive all further inquiry as to alimony, and submit to the award made at the special term in January, 1852, without prejudice to his prosecuting an appeal from the judgment of divorce. But this the defendant would not do. On the return of the plaintiff, and as soon as she was able to procure counsel to attend the reference, it was noticed, and then was commenced a series of efforts to postpone and prolong the hearing, and which by motions and appeals from orders and from the final order for alimony, protracted the controversy in the Superior Court until March, 1862, and at an expense to the plaintiff for the whole litigation, exclusive of taxable costs, and which is now due and unpaid, of seven thousand dollars. Under these circumstances, I think it was no abuse of judicial discretion to date the award of alimony from the commencement of the *520 action, and hence no question of law is involved in the decision.
The allowance for permanent alimony, and from what date it shall commence, as has been said, are questions resting in the discretion of the court. There “ is no other rule or criterion to guide than the bom viri arbitrium.” As it is a judicial and not an arbitrary discretion to be exercised, I do not-say that there may not be an appeal from such an order. The power must, however, be shown to have been arbitrarily exercised. Otherwise, the law does not contemplate a review of such decisions in this court. •
The judgment and order of the Superior Court should tie affirmied.
All the judges concurring,
Judgment and order affirmed.