Nelson, Ch. J.
The points in this case have been very much narrowed by the concession of counsel that they could not, as the proof stood, expect to sustain that part of the appeal going to the decree of separation a mensa et tlioro on the ground of cruel and inhuman treatment. The principal question in the case, therefore, is as to the fitness and propriety of the allowance of alimony made by the courts below, for the support and maintenance of the wife during the separation.
The chancellor and vice chancellor have concurred substantially in the sum to be allowed; but the appellant insists that the allowance is unreasonable, extravagant, and beyond any authority conferred by law.
The statute provides that “ upon decreeing a separation &c., the court may make such order and decree for the suitable support and maintenance of the wife Spc., by the husband, or out of his property, as may appear just and proper.” (2 R. S. 147, § 54.)
The proofs in the case establish that the estate of the husband, real and personal, exceeds a million of dollars: That there are no children of this marriage surviving, and but one of a former marriage, (a wandering, unfortunate son, whom the father seems to have abandoned,) having any special or family claims upon the property; That a few years after the *210 marriage with the respondent, which was in 1799, the husband received some $7000 as the distributive share of his wife in her father’s estate: That she was a woman of education and refinement, of the first respectability, at the time of her marriage, and has sustained that character in an eminent degree throughout the whole course of her life: That a short time after the marriage, without any fault or provocation on her part, the appellant commenced a course of systematic cruelty and oppression towards her; of foul mouthed abuse and brutal violence, the very recital of which is unfit for a court of justice, and which continued, with few intervals, until her constitution and health sunk under the weight of her sufferings, and she was at last compelled to flee for refuge to her family connexions and friends. This was in 1835; since which time she has lived without any provision being made for her support, until 1841, some six years, when the present bill was filed, and an allowance of $2000 a year ordered pending the litigation.
The scenes of suffering through which this lady has passed during her cohabitation with the appellant, are so shocking and revolting to our nature as to induce one to discredit the account, were it not partially admitted in the answer, and most abundantly substantiated by the witnesses. It is not important to dwell upon this point of the case, however, as the decree for a separation a mensa et thoro—the justice and propriety of which, as already mentioned, are not questioned—fully justifies her withdrawal from his protection, and entitles her to a reasonable and liberal provision out of his property for support and maintenance. The only question is as to the amount.
The counsel for the appellant seemed to suppose that some question of law was involved in this inquiry, arising upon the statute. If they meant that the discretion of the court to be exercised in determining what amount of alimony would afford a “suitable support and maintenance” and be “just and'proper” under the circumstances of the case, is a judicial discretion, and not ap arbitrary one, I agree to the proposition. But beyond this, there is nothing like a question of law that can be raised upon the statute.
*211 The general rule is, that the wife is entitled to a support corresponding to her rank and condition in life, and the fortune of the husband. The law has fixed no definite proportion of his estate to be allotted for permanent alimony, in case of separation ; and the court must therefore look to all the circumstances of the particular case, as no two are alike, in order to award what is fair and just between the parties. Where the delinquency of the husband has been established, and the wife is the injured party, driven by his cruelty from the comfort of domestic enjoyments, she should be liberally supported.
I find it a settled principle in the ecclesiastical courts, which have exclusive jurisdiction of these questions in England, to make a more liberal alloivance in case of aggravating circumstances in the conduct of the husband, and where no imputation exists against the wife, than in other cases. (2 Phill. 44, 46, 110; 2 Addams, 2.) So the amount is always influenced more or less by the fact that the husband has a family of children to support. (2 Phill. 110; 3 id. 259.) In many cases the third part of the annual income of the husband has been assigned as permanent alimony; in others a moiety. (2 Roper On Husb. & Wife, 310, note, Jacob's ed.; Shelford On Marr. & Div. 592.) The cases referred to by the court below (a) are very strong authorities for the amount of the allowance in this case; especially, the case of the Countess of Pomfret, where one-third of a large income was assigned to her, under circumstances not as aggravating as those disclosed here.
Undoubtedly an income of $10,000 a year is a large allowance in this country, where estates are usually small, by reason of the constant subdivisions going on under the operation of our statute of descents and against perpetuities. But we must not forget that the estate of the appellant exceeds half a million, and that his unfortunate wife is the only human being, except the vagrant, outlawed son, that has any special family claims upon it: That she must now be approaching seventy years of age, with a constitution broken, and her health ruined,, in conse *212 quence of her unexampled hardships and sufferings; and of course it cannot he expected that she will be left to enjoy the allowance made for her beyond the limit of a few years: That no provision was made for her support and maintenance for some six years succeeding the separation ; a very material and proper ■circumstance to be taken into the account in fixing the allowance. 'And I agree with the chancellor, and the decisions in the ecclesiastical courts fully warrant the remark, that if a few years of affluence can, to any extenq compensate her for the more than thirty years unparalleled sufferings and misery which she has endured, either by the gratification of her feelings in the remuneration of those who have sheltered and nourished her in adversity, or in procuring those indulgences and comforts which her age and health may require, it will not be an improper exercise of the discretion of the court—the ample means of the husband justifying it—to make the most liberal allowance.
The amount allowed in the present case, according to the weight of the evidence before us, does not probably exceed one fifth or sixth of the husband’s annual income. I am satisfied that it is well sustained, not only upon the fitness, propriety and justice of the thing itself, under the circumstances, but by the whole current of precedent and authority on the subject.
There are one or two minor objections made to the decree, which I will briefly notice. It is said the court erred in directing the allowance of alimony to commence from the filing of the bill, instead of the date of the decree. This is a matter of discretion, depending upon the special circumstances of the case. It was hardly insisted upon indeed as involving a question of law. Perhaps in practice the ecclesiastical courts in England ■ usually date the allowance from the time of the decree; but this is not binding upon us here. I confess it seems to me that in point of consistency and propriety the allowance should commence at the time of filing the bill. The case was then made out. All the facts existed at that time upon which the alimony was allowed: and if the respondent is entitled to it at all, she was as much entitled to it then as at any subsequent period.
*213 Again, it is said the court below erred in directing that if the annuity was not paid quarterly, as it became due, the money should belong to the wife, with power to dispose of it at her death by an instrument in the nature of a will. The object of this direction was to take from the appellant any temptation to withhold the payment of the alimony at the time designated. Unless this power was given, any unpaid balance at her decease should of course go to the husband; and as she is aged and infirm, his past conduct may well justify the apprehension that he would not hesitate to try the experiment of fighting off the quarterly payments, with the hope that in the meantime death might intervene and relieve him from the burden imposed by the decree. The right to give this direction in respect to the fund is not to be doubted. The same power that can vest her with an absolute separate interest in a portion of the husband’s estate, can enable her to dispose of it as she may think proper. Indeed, the right to make the disposition is incident to and arises out of the absolute ownership in the separate estate which the statute has authorized the court to confer on her, although it is usual to accompany the allowance with an express power. The wife has always been allowed in equity to dispose of her separate estate by an instrument in writing in the nature of a will; and a court of equity will see that .her directions are carried into execution.
For these reasons l am of opinion that the decree of the chancellor should be affirmed.
Strong, Senator.
Alimony is the maintenance or support which a husband is bound to give to his wife upon a separation from her; or the support which either father or mother is bound to give to his or her children, though this is more usually called maintenance. It is granted in proportion to the wants of the person requiring it, and the circumstances of those who are to pay it. (Poynter On Marr. & Div. 248; 1 Bl. Comm. 441; 3 id. 94; Bouv. Law Dict. “ Alimony Roper On Husb, & Wife, 308, n. (k).)
A much larger al lowance is to be made for permanent alimony *214 than for alimony pending suit. (2 Phill. R. 109; Id. 40; 3 Paige, 501; Shelford On Marr. & Div. 592.)
It is contended on the part of the appellant in this case, that the alimony, or, in the words of the statute, the amount allowed by the chancellor to Mrs. Burr for her “ support and maintenance,” is too great, and should be reduced. This is doubtless the subject of appeal: but a strong case must be presented before this court would be justified in interfering with the decree of the court below as to the amount merely, if no legal principle has been violated. In Cooke v. Cooke, (2 Phill. Rep. 40,) the court say: “Now, although alimony, that is, the allowance to be made to a wife for her maintenance, either during a matrimonial suit, or where she has proved herself entitled to a separate maintenance, is said to be discretionary with the court; yet it is a judicial, not an arbitrary discretion, which is to be exercised ; and therefore it is clearly a subject of appeal: at the same time, upon a point where there is no other rule or criterion to guide than the boni viri arbitrium, it is only upon a strong difference of opinion where the court of appeal would be disposed to disturb the sentence.”
The position is sought to be maintained here that the law contemplates only a tolerable and comfortable subsistence for the wife, without much reference, if any, to the pecuniary circumstances and ability of the husband; that after the point of support and maintenance, in a strict and limited meaning of the terms, is attained, the letter and spirit of the statute are satisfied, and the power of the courts is exhausted.
Marriage by our laws is treated only as a civil contract, and is invested with every attribute and obligation which can attach to the most solemn agreeement between men. It is based, to a very great extent, on the assumption of equality between the parties, and may be said to be almost indissoluble, as it cannot be voluntarily waived even by joint consent, and so few are the legal causes for annulling it. Although the chief authority must necessarily be lodged in the husband, and from self-evident policy the law will not allow the wife to enter into contracts to bind him except for necessaries which he refuses to provide for *215 her, yet they have a common and indivisible, interest in prosperity and adversity. Both are elevated or depressed by the same causes; and each is more or less affected by what concerns the other. If from poverty and obscurity the husband' advances to fortune and reputation, his partner rises with him pari passu, and becomes entitled by the law of the land, as well as by social rule, to the rights, benefits and privileges of his new position. For almost all purposes they are regarded in the eye of the law as one person, having one interest, and inseparable in their earthly destinies. As between themselves, so carefully is the wife protected against the effects of the imprudence or misfortune of her husband, that she may refuse to alienate her rights in any part of his real estate, no matter how valuable or extensive it may be; nor can they be divested by any compulsory process of law against the husband, without her consent. In case of his death, she enjoys during her lifetime, unconditionally, and without the power of interference from any court, one third of the rents and profits of his land and buildings, without regard to their value.
On what principle is the wife’s dower allowed ? Why should she not be restricted, where the property is large, to a comfortable maintenance and support ? Why should she receive the income of one third of a vast and productive landed estate, towards the acquisition of which she may have contributed nothing, and hold it free and clear from every incumbrance created by her husband except for purchase money ? The answer is obvious. Whatever increases his fortune is regarded by the law of civilized life as adding also to her prosperity. If he becomes rich, she is not to continue poor. If his possessions are ample, the law will not compel her to remain in a state of comparative poverty. If a great abundance of.wealth is thought so desirable by the husband that he has devoted a life of toil and perplexity to its accumulation, a just and fair proportion of it, without reference to what in other circumstances would be sufficient merely for a comfortable support, is supposed to be equally desirable and necessary for her, who has travelled with him for a long period in the same path of acquisition, whose mind has *216 been bent and moulded constantly and for years towards the same objects of pursuit which have engrossed his thoughts and invited his energies, and whose domestic economy, directed to the same purposes, has been, if not the starting point, at least a leading auxiliary of his success. Her wants have been fashioned and graduated by his standard; and whether he has accumulated property to spend or to hoard, it is fair to presume that, while he lias been incited by a want of it for the one or the other of these purposes, his companion for life has sympathized with his feelings, has imbibed his tastes and habits of thought, and has been impelled by the same real or imaginary necessity to a constant and never-ceasing acquisition.
Wealth and poverty are relative terms; and if courts should adopt the rule contended for on the part of the appellant, and cut themselves loose from a consideration of the amount of the husband’s income, in making a suitable provision for the wife in cases of separation, they would find themselves upon a new and wide field of inquiry, with no other guide than the opinions, of numberless and conflicting witnesses as to the amount required to meet the actual wants and necessities of the wife, and would eventually be compelled to adopt some arbitrary sum as a maximum to be exceeded in no case and under no circumstances. In the case under consideration, where the appellant is shown to be worth a million or upwards, which is well invested and probably yields an annual nett income of from four to seven per cent, by what safe, certain and unquestionable rule can this court be governed in lessening the amount of alimony allowed by the court of chancery'? To what point shall it be reduced, so that it cannot be as well objected as now that it is still too large? The annual amount allotted to Mrs. Burr would be considered in many parts of the country a fortune; but the same may be said of almost any less sum until we approximate the low point of absolute necessity. One half or even one third of the allowance would be liable to every legal objection that is now urged, and could as readily be made the basis of visionary and fanciful calculations. Any of these sums may perhaps be considered, without impropriety, as greater than the mere com *217 fortable living of a lady in the situation of the respondent, advanced in years, and with a constitution broken by the unnatural conduct of her husband, might demand. This court, however, if it should attempt to alter the amount decreed by the court below, because it might be higher than in the judgment of different members it should have been if the question had been submitted to them, acting as original and inferior judges, would find the task of fixing the allowance with legal and mathematical exactitude as difficult and perhaps as endless as that which often devolves upon a jury in assessing damages in actions of tort; and to whatever conclusion it should ultimately arrive, its decision, unless made on the principle that the amount of the husband’s income must be disregarded, and reference had only to supplying the ordinary necessities of the wife, would be the precursor of confusion in the courts, and leave them without even a tolerably definite rule of action.
It is also made a point on the part of the appellant that no enhanced allowance could be made either for the purpose of punishing the appellant, or of gratifying the feelings of the respondent, or of remunerating her for her alleged sufferings, or of enabling her to remunerate others for their acts of kindness. The statute authorizes the court to make such allowance to the wife for her suitable maintenance and support out of the property of the husband as shall be just and proper. The primary object is the protection and support of the wife. So, in many actions at law, as for assault and battery, words spoken, trespass, and other torts, the suit is instituted mainly to enable the plaintiff to recover the damages he has actually sustained. But in aggravated cases of this nature, are not jurors daily charged to give such damages as shall not only remunerate the plaintiff, but operate as a punishment to the defendant; as shall deter him and others in like cases offending from the perpetration of similar enormities; as shall not only compensate, the plaintiff for his sufferings, but also enable him to remunerate his counsel (a) *218 and others, who have aided him, and on whom he has been compelled to depend in order to procure redress ? In the action for seduction, which, technically, can be brought only for loss of service, are not heavy damages constantly awarded, where, according to" the strict nature of the action, the real damage sustained is merely nominal ? Do not the jury, under the direction of the court, punish the defendant ? Do they not gratify,the feelings of the plaintiff? Do they not take into consideration the sufferings and loss of reputation of the seduced victim, and every necessary expense incurred and trouble sustained, and award damages accordingly? The only difference in this respect between such cases and the one now before the court is, that in the former the common law requires the jury, in the latter the statute directs the court,to do what is “just and proper.” If a wanton and malicious outrage is committed upon the civil rights of an individual, it would oftentimes be monstrous injustice to confine the injured party, when seeking for redress, to the actual ascertainable damages he may have sustained. Such a rule would be a license to every species of private wrong; and in most cases of trespass to the person, it would be impossible to apply it with any degree of accuracy. A gross insult, like that for instance of spitting in a person’s face in a public place, and under circumstances calculated deeply to wound his feelings and disgrace his character, would be fully expiated by six cents damages; for nothing must be allowed by way of punishment to the offender, and nothing to atone for the lacerated sensibilities of the aggrieved party. Exemplary damages would be unknown in civil proceedings, and the most malignant passions would be restrained only by the strong arm of the criminal law.
A just and proper allowance to the wife cannot be settled in any case without reference, in the first place, to the husband’s means, and if they are ample, then to the condition or station of the parties in life, and all the circumstances, near or remote, which tended to produce the separation; and in view of all these facts, the court is to exercise a sound, discreet, and dispassionate judgment. Where the husband’s income is unusually large, and the ill treatment, which produced the separation, has *219 been extremely inhuman, and continued for a long period, the clear dictates of justice, and a proper regard for the protection of public morals, require that the atrocity of the case should be taken into consideration, so that it should be distinguished from those where faults are more venial or have been of shorter duration. The court must exercise a judicial discretion, not arbitrary or vindictive, but which will be found to accord with that sober sense of justice common to mankind.
The adjudications of the courts, both in England and this country, perhaps without an exception, will be found to embrace these principles.
In Cooke v. Cooke, (2 Phill. R. 40,) the wife had a separate' income, and made no application for alimony during suit. About a moiety of the husband’s income was given to the wife for permanent alimony. In that ease the court say, that it is a part of the duty of every court of justice to guard the public morals of society; that this principle has been fully established and forcibly applied to cases where the husband is the injured party; that it is on this principle that pecuniary damages are awarded in other courts; and that where the husband is the delinquent and the wife the injured party, the same principle may be justly-applied.
In Otway v. Otway, (2 Phill. R. 109,) the joint income of the husband and wife was 5500l. After deducting the expenses of supporting the children, estimated at 1500l., the wife was allowed 2000Z. per annum, that being one half of the remainder. The court say: " The delinquency of the husband is established ; the wife is the injured party; she is separated from the comforts of matrimonial society, from the society of her family, not by the act of Providence, but by the misconduct of her husband : she must be liberally supported. The law has laid down no exact proportion. It gives sometimes a third, sometimes a moiety, according to circumstances.”
In Smith v. Smith, (2 Phill. R. 235,) the joint income was 2000Z., and 1000Z. was allotted to the wife. The court there say: “ It is a rule of equity that no man shall take advantage of his own wrong. Perhaps it would be but just that where the *220 husband violates the matrimonial engagement, and the fortune originally belonged to the wife, he should give back the whole of it. Courts however have not gone that length.”
In Lord Pomfrefs case, decided in the Arches court of Canterbury, May 14th, 1796, where the fortune came principally by the wife, the income was 12000l.; and the court allotted one third to the wife. What weighed there was, that the husband was a peer, and that the public had an interest that he should be able adequately to maintain his station.
In Mytton v. Mytton, (3 Hagg. Rep. 657,) the husband had settled on his wife 500l. a year for pin-money. Any payment of this money exceeding 200l. a year was to be deducted from the 1000Z. which was decreed for alimony. The gross income of the husband was 6000l., subject to a deduction of 4350l. for incumbrances and interest on debts incurred by him, leaving a nett income of only 1650l. In this case the court remark: “A husband, who has such a fortune as to give that sum for pin-money, (500l.,) should make an ample allowance for his wife, while living separately on account of his misconduct.”
In most of the cases above cited, a considerable, if not a large proportion of the property, came by the wife. This fact, however, is not made the sole or even principal reason for a liberal alimony. Sometimes it is related in the history of the case as one of its incidents, and sometimes it is referred to by the court, among other things, as a circumstance which strengthens the claim of the wife, and renders the justice of a large allowance clear and certain. But there is nothing in these cases from which the inference can be fairly deduced, that if the property had not come by the wife, the court would have felt itself constrained by principles of equitable law to have greatly reduced the allowance. The case of Mytton v. Mytton certainly repudiates this idea, and proceeds directly on the principle that where the husband is possessed of a large fortune, he must make an ample allowance to the wife while separated from him by his misconduct.
It is however in proof in the case before us that, before the close of the year 1813, the sum of about $7000 came to the ap *221 pellant through his wife. That sum at compound interest for thirty years would amount to upwards of $50,000; and it was probably the corner-stone on which the appellant has reared his fortune.
In the case of Prather v. Prather, (4 Dessaus. 33,) an allowance was made for alimony of one third of the husband’s income, although the wife brought no property. The court say, that the wife acquires .by her marriage, in return for the comforts she brings, the right to maintenance and support, and to a participation in the enjoyment of her husband’s property, according to his degree and station in life, while she demeans herself correctly. In Taylor v. Taylor, (4 Dessaus. 165,) and in Williams v. Williams, (id. 183,) one third of the nett income was decreed to the wife, and in the latter case sufficient besides to board and educate three daughters who were placed under the guardianship of the wife.
In this state the court of chancery has usually allowed to the wife for permanent alimony from one fourth to one half of the husband’s income, when she was not to have the custody of the children of the marriage. (Lawrence v. Lawrence, 3 Paige 273; Peckford v. Peckford, 1 id 274.)
The word “ suitable ” in our statute is far from being devoid of meaning. On the contrary, it is a most significant and comprehensive term. The wife must not only be maintained and supported, but her maintenance and support must be suitable. In Lord Pomfret’s case, the wife was put off with only 4000Z. per annum, being one third of the annual income of an estate of which she brought the largest part; and the court felt itself bound to apologize for allowing the husband to retain two thirds, by alleging as a reason that he was a peer of the realm, and must be enabled adequately to maintain his station. Fortunately, our laws are cognizant of no such dignities, and the suitableness of an allowance must be determined without reference to aristocratic institutions. It by no means follows, however, that in this country all circumstances relating to the condition of the parties may be disregarded, or that unbounded wealth is to contribute no more to the support of an injured and *222 maltreated wife than a moderate and middling competency. While neither husband nor wife has the dignity and splendor of titles to uphold, they have their relative and social condition, which, in mere questions of property certainly, can command the protection and justice of the courts to which either may be compelled to resort on account of the injustice of the other; and this condition is made up of a variety of circumstances, of which, in cases like that under consideration, one of the most material is the amplitude of the husband’s fortune.
In regard to the objection that • the decree should have made provision for a reduction or discontinuance of the alimony, if the appellant dies leaving a competent provision for the respondent by will, it is enough to say that the appellant has power to obviate this objection by his own mere volition.
Nor does there seem to be much greater force in the point that the chancellor erred in assuming to authorize the respondent to dispose of the amount allowed as alimony by an instrument in the nature of a will. The sum allowed is of course personal property, and if it is just that she should have an allowance at all, is it wrong that she should have the power of disposing of it? Is it not her property, while living, and is there any impropriety, in cases like the present, in guarding against an attempt on the part of the appellant, by delaying the payment of the alimony, to defeat the decree of the court ?
As respects the time when the alimony is to commence, unless this clearly indicates an abuse of judicial discretion in the court below, it does not appear to be a sufficient ground of error to require from this court a modification of the decree. The rule of the English courts seems to be that permanent alimony shall commence from the date’of the sentence of separation; (Cooke v. Cooke, 2 Phill. R. 40;) but it is usual to compute the allowance for alimony pendente lite from the return of the citation; (Baine v. Baine, 2 Addams, 254;) though in cases of delay occcasioned by the husband, it is in the discretion of the court to allow it from the date of the citation. In our own courts no settled practice has obtained on this subject otherwise than as deducible from the English decisions; and as in this *223 case there has been no violation of the discretionary power of the court of chancery, and as fixing the time for the commencement of the alimony from the filing of the bill tends only to promote the ends of justice, no evil can arise in leaving the decree undisturbed on that account.
The power of the court of chancery in granting a separation from bed and board is by our statute (2 R. S. 147) restricted to complaints on the application of the wife alone; and such separation may be decreed for the following causes, viz: 1. The cruel and inhuman treatment by the husband of his wife; 2. Such conduct on the part of the husband towards his wife as may render it unsafe and improper for her to cohabit with him; and 3. The abandonment of the wife by the husband and his refusal or neglect to provide for her. In the present case the evidence clearly establishes one or both of the causes specified in the first and second subdivisions. Perhaps no case has been presented to a court—certainly none is recorded— exhibiting greater inhumanity on the part of a husband towards his wife. Nurtured and reared in affluence, of a family of the highest respectability, mingling from her youth with" a refined, educated and polished society, -possessing talents of a superior order, accomplished, amiable, and beloved, in an evil hour she forsook the endearments of her home, and gave her hand to him who has since embittered every moment of her existence, poisoned every source of her domestic happiness, and now, that she has been compelled by his misconduct to flee from the shelter of his roof, is pursuing her through every court of justice and to the law’s last extremity, to deprive her, even at the expense of his own public infamy, of that honorable maintenance and support to which his fortune and her virtues entitle her. For thirty-five years, she was a meek and silent sufferer under the daily and death-dealing inflictions of one who had sworn at the altar of God to love, cherish and protect her. Almost within a month from the consecration of their nuptials, she exhibited the marks and ravages of a loathsome and noxious disease, the seeds of which he had already implanted in her system, there to germinate and grow till their deadly influence *224 should prostrate her physical powers, or the grave should claim its weakened and premature victim. A common and sickly offspring for a few years of miserable existence bore about them the evidences alike of their own wretchedness and their father’s shame—and then went down to an early tomb. But it was not enough that the uncomplaining wife had been murderously visited with the plague-spots of her husband’s leprosy. He must treat her with studied and malicious coldness, indifference- and neglect, and at times with personal violence ; address her in harsh, opprobrious and abusive language; deprive her of necessary comforts and remedies in sickness, and in her ordinary health compel her to servile and unworthy employments; coercing her at times to clean his self-defiled person—a work unfit to be required of the veriest menial, and proper only for himself. These and other things equally offensive, and too disgusting to be repeated in detail, are abundantly made out by the evidence, if not admitted; and are proved to have commenced within the first year of marriage and continued down to the time of separation. During the whole period, and under all provocations, Mrs. Burr conducted herself as a mild, respectful, affectionate, submissive and ’devoted wife. On no occasion did she resist the authority of her tyrannical lord, or seek to irritate his morose or excited temper. She even charged her servants not to speak of his ill-treatment of her to others. She • bore with his profligacy, his intemperance, his neglect, his coldness, his cruelty, his brutality, until, prostrated by bodily disease and overwhelmed with mental anguish, she could bear with them no longer, and was forced to a final separation. And then not until deprived of every other resource, and driven to the verge of starvation, did she venture to enter the courts of justice and spread her sorrows before the world.
If a larger amount had been allotted in this case, it could not, under all the circumstances, be considered excessive; and as there has been no departure from the proper exercise of judicial discretion on the part of the chancellor, his decree ought to be affirmed.
*225 Franklin, Hopkins, Putnam and Scott, Senators, also delivered opinions in favor of affirming the chancellor’s decree.
Bockee, Senator.
It was admitted on the argument of this cause that the decree of the vice chancellor, so far as relates to the separation from bed and board, was strictly proper, and was called for by the circumstances of unkind treatment and aggravated cruelty practised on the part of the appellant. As a consequence it was also admitted that the court had full power and authority under the statute to decree an allowance for the “ suitable support and maintenance of the respondent.” The controversy between these parties is then brought to a single question, and that a very limited one, viz. whether the extraordinary allowance of ten thousand dollars per annum for the support of the wife is authorized by the statute?
• The court of chancery has no power or jurisdiction in the matter of divorces or separation, except that which is conferred by the statute. We are not to range abroad through all nations, kingdoms and states, in search of authorities to determine the meaning of a statutory provision of our legislature. It is in vain to look for authorities in point derived from the practice under the civil or the canon law; from the Napoleon code or from the Arkansas reports. The court is limited to a consideration of the provisions of the statute, and is to execute them according to their obvious meaning. I cannot admit that the proceedings of foreign judicatories, where the distinctions of titled rank obtain, where a different system of government and laws is established, and where manners and circumstances are entirely dissimilar to those which exist here, can afford any rule or guide to us on this particular question of the amount to be allowed for maintenance under the provisions of the statute of divorces.
The decision of this question will depend upon the construction to be given to the 54th section of chapter 8, part 2d, of the revised statutes, which is as follows: “ Upon decreeing a separation in any such suit, the court may make such further decree as the nature and circumstances of the case may require, and *226 may make such order or decree for the suitable support and maintenance of the wife and her children, or any of them, by the husband, or out' of his property, as may appear just and proper.” The whole law of this case lies within the narrow compass of this section of the statute.
The general clause that the court may “ make such further decree as the nature and circumstances of the case may require,” must be construed in reference to the main object of the decree, and as giving power only to make those incidental provisions which may be proper and necessary to carry the specific and affirmative enactments of the statute into effect.. To provide that the wife shall enjoy her personal liberty free from any annoyance by the husband, that the offspring shall be under the care and direction of the husband or the wife as circumstances may render expedient, and the usual and proper direction as to the payment and security of the alimony allowed to the wife, are within the scope and meaning of this general clause. We would viólate all fair rules of construction were we to extend it to matters extraneous to the general design of the statute. The clause does not authorize any and every decree which the court might wish to make, or which an extravagant fancy might suggest. It does not authorize the court to dissolve the marriage relations, to change the laws of inheritance or succession, to send the husband into exile, or to divide his estate among the wife and children, according to the statute of distributions.
We come then to the second clause of the section we are considering, which is, that the court may “ make such order and decree for the suitable support and maintenance of the wife and her children &c., by the husband, or out of his property, as may appear just and proper,” Suitable support and maintenance is the object and purpose of the statute. The words “just and proper,” in the close of the section, do clearly and intelligibly refer to maintenance, not to a division of property. We should not be warranted in construing them as an enlargement of the power of the court beyond the previous express limitation, A decreed separation from bed and board leaves the *227 rights of property, as between husband and wife, exactly as they stood before. The rights of the wife as to dower and distribution remain unimpaired. Marriage transfers from the wife to the husband, in absolute property, all the personal estate of which she is possessed at the time of the marriage, or which the husband reduces to possession during the coverture. In case of separation from bed and board, it would seem to be very equitable that the property which the wife brought to the husband should be restored to her. Yet the law makes no such provision, and the policy of such a provision may perhaps be very questionable. The law places the wife under the care, protection, and I may say, not the despotic, but the reasonable authority of the husband. If she had the right of claiming the restoration of property in cases of separation, she might be rendered too independent for domestic peace; more so than the law intended she should be. Such a state of independence might interfere with the mutual obligations of the parties, and lay the foundation of that discord which would lead to a severance of the matrimonial ties. This however is suggested as a mere speculative enquiry, for the purpose of showing that there may be some reason for the apparent harshness and want of equity in the law which in cases of mere separation withholds from the wife all right or claim to such property as by cover ture has become absolutely vested in the husband. The court of chancery has no power directly to award restitution to the wife of her personal estate, and of course has not a right indirectly to transfer it into her possession by swelling the annual stipend to an amount far beyond what is proper and suitable for her support and maintenance. It is not material to enquire what amount of property Mrs. Burr brought to her husband ; for whether it was ten dollars, or ten millions of dollars, the rule of law to be applied to the case is precisely the same. We must be governed by the law as it is, restricting the allowance to what is suitable for maintenance, and preserving to the wife all the rights of property to which married women are entitled.
A very large allowance of alimony is justified by the vice chancellor for the reason that it will operate ás a means of *228 punishment; especially to the defendant who makes his money his god! Seldom do we meet with a judicial declaration so pregnant with implications that are unfounded and untenable. If the vice chancellor was armed with the power of vindictive justice, as he imagined himself to be, that justice should have been tempered with mercy. Why did he not mercifully and forbearingly inflict upon the defendant stripes and imprisonment ? Did the vice chancellor, by way of punishing the appellant, select the chosen idol of his soul as the medium through which the most excruciating wound could be given, and the tenderes! nerve which vibrates to the heart be racked in agony? Do we live under an Asiatic despotism, where the nod of the vizier can consign his victims to the dungeon and' the bowstring? Whence this pretence of punishment, arbitrary, unmeasured and undefined, in a land of law and liberty, and under a statute that is merely remedial and preventive ? If the defendant had committed a criminal offence, it is cognizable in the ordinary courts of justice, where he can be prosecuted only on the presentment of a jury, and is entitled to the benefit of a trial by his peers. The evidence does indeed exhibit a course of unkind and inhuman treatment which most amply justifies the decree of separation ; but I do not discover any acts of personal violence, or any positive transgression of law, which would be the subject of criminal jurisdiction. And if the defendant had been guilty of such transgression, I know not whence the court of chancery can derive its jurisdiction and power to punish, or how it can be justified in denying, even to this defendant, the constitutional privilege of trial by jury, according to the course of the common law. I am confident that no authority can be found any where (except in the code of Judge Lynch) to punish the appellant for the unkind, indecent and unmentionable abuses which marked and degraded his domestic life. Let not the law and the constitution be violated and trampled under foot because this man has trespassed upon decorum and humanity. If be was the veriest brute that ever disgraced the human form, it is no reason that the court should forget its duties, usurp power and inflict punishment without law.
*229 Another feature of this declaration of the vice chancellor is extrajudicial, and leads to reflections still more grave and solemn. From the case which is laid before us, the defendant appears to be sunk in the practice of the most degrading vices. No single virtue can be discovered peering through the dark catalogue of his sins, except that of economy carried to excess. Yet in the most degraded of our erring and fallen race there is a redeeming and immortal spirit which by divine grace may rise above its debasement; and He alone who knows the secrets of all hearts, to whom it would be blasphemy to compare any human tribunal, can determine whether the defendant has renounced the homage due to his creator, and made money his god.
It is stated by the vice chancellor, as another ground for extraordinary allowance in this case, that it would be a just remuneration to the respondent for five and thirty years of patient suffering and irksome and menial service, for blighted hopes, ruined health, and a broken heart. This is an appeal to the sympathies of our nature which it is difficult to resist. We cannot be wholly insensible to that humane and chivalric feeling which has moved the sensibilities of the bench, and arrayed this respondent in the morning of her days in all the gayety and fascination of beauty and youth; which has clothed her with all the refinement and attractions that talents and cultivation could give, and depicted her in loveliness, in splendor and joy, cheering and delighting the elevated circle in which she moved: and to see all these elegancies and accomplishments cast like pearls before swine, is calculated to drive us from our propriety, and hurry us into forgetfulness of the staid rules of the law. Let us endeavor, however, to administer the law in its plainness, as it is marked and laid down to us, and leave those kind and generous sympathies to a different and more appropriate sphere of action.
I must, in the soberness of truth and reason, dissent from the opinipn that any thing can be given by way of remuneration to the respondent for sufferings arising from this most loathsome and revolting connection. The law gives to an unfortunate wife, suffering trader the ill treatment of her husband, nothing *230 more than protection and support, It holds out no other boon; it offers no other inducement to separation; it goes just so far as motives and feelings of humanity would prescribe, and there it stops. It does not open a ledgered account and strike a balance between the joys and sufferings of married life. The items of such an account current would be too delicate and intangible to ■ be the subjects of judicial inquiry. Remuneration is impossible, and the law does not undertake or profess to give it. It may by some be considered a proof of my own disgraceful ignorance, but I must confess that I have never heard of any action or mode of proceeding, either in law or equity, by which damages for matrimonial infelicity could be liquidated, ascertained or recovered. In this case, it appears that within the first six weeks of the marriage, events transpired which placed it in the power of the respondent' to be absolved from this abhorred connexion. A question of expediency was presented, for her sole and particular decision. On the propriety of this, from the nature of the question, no other person could have either knowledge or opinion. She chose or submitted to cohabitation and its consequent sufferings. Whatever sympathies may be felt, the court of chancery cannot transcend the power of the law, and cut deep into the estate of the appellant, for the avowed purpose of remunerating the respondent for those sufferings.
There is another principle stated as a ground of decision in the opinion of the chancellor which appears to me very untoward; not to be reconciled with the policy of the law, and inconsistent with its direct and express provisions. He would make the respondent affluent, beyond all reasonable requirements for her suitable support, that she may gratify her feelings in rewarding the attachment and services of her friends. This is entering into a new and untried field of experiment. If the respondent is to be placed in funds for the purpose of gratifying her feelings and the feelings of her friends by pecuniary donations, then there are no assignable limits to the provision proper to be made for her. It requires no prophetic spirit to foresee that there would be friends enough and cupidity enough to exhaust the estate of the appellant, large 'as it is. In the regulation of *231 families, and the minor disagreements which may arise between husband and wife, the interference of friends may sometimes be impertinent and mischievous. There are those whose vocation is not blessed, like that of the peace-maker. To hold up the prospect of pecuniary reward to the friends of the injured wife, would be most injurious and immoral. It would promote and inflame differences, instead of reconciling them. The influence of such a proceeding upon the welfare of society, and the peace and harmony, of families, could not be otherwise than evil, and that continually. Where there is wealth, there will the birds of evil omen—the hungry cormorants—hover around to glut themselves with prey. Let us not carry into practice this new and hazardous principle of legislation, involving a departure from judicial functions, until we find some clause introduced into our statute authorizing the court, in addition to the allowance of alimony, to set apart some specific portion of the husband’s estate as a fund from which the wife may be enabled to gratify her feelings by rewarding the attachment of her friends. But the statute does not and never intended to place fortune at the disposal of the wife. It provides that the chancellor shall make an allowance for the suitable support and maintenance of the wife and her children, If this clause of the statute is so potent as to authorize the chancellor to carve an independent fortune out of the husband’s estate, for the benefit of the wife, her relatives and friends, there is no reason why the same provision shall not be construed as benignly and favorably to the interests of the children, and the consequence will be that the rich man’s estate may be divided, not according to the provisions of law, nor according to his own will, but at the discretion of the chancellor. This would be the introduction of-a new mode of confiscation, not by legislation, but by judicial power. It never could have been the intention of the legislature to vest this unchecked and unlimited power in any court. There does not appear to be any special and obvious necessity for giving such power to the court of chancery. The exercise of such power, even in a case like the present, where the unfeeling conduct of the party seems to have stamped tire mark of *232 Cain upon him, would be but the mild, iniatory form of judicial despotism. It is the instinct of tyranny to approach with insidious steps, and its 'first essays in violation of law are in cases where popular feeling or prejudice will excuse if not applaud the act. The legislature has been cautious in the delegation of power, but has given full and ample power for all beneficent purposes. Adequate protection and suitable support is given to the wife when separated from her husband, and the chancellor may decree a separation for a limited time, or may revoke the decree of separation on the application of the parties. He may give time for angry passions to subside, for injuries to be' forgotten, for love and reason and penitence to resume their influence. The law contemplates and invites reunion. It beneficently keeps open the door of reconciliation. Let not the almighty power of King Plutus close that door forever. Let not the selfishness of connexions and expectants interpose obstacles and raise an impassable barrier against returning affection and conjugal duty. Let not the precedent drawn from the Book of Life be reversed ; and the money changers be permitted to enter the temple of pure and holy affection.
From a deliberate consideration of this subject, in the coolness of reflection, and free fr.om those impulses which the unamiable character of the appellant and the . unsavory nature of the case are calculated to produce, my mind is brought to the conclusion that the court has no arbitrary power over the appellant’s estate on the principle of distribution; that alimony is not to be increased because the wife brought property to the husband, or for the purpose of punishing the husband for his misdeeds; nor to remunerate the wife for the sufferings she may have endured, or to enable her to gratify her feelings by the distribution of pecuniary donations among her friends. I feel bound to adhere to the words of the statute, and to comply with its plain and obvious meaning. There is indeed a discretionary power given by the law as to the amount of alimony to be allowed; but that discretion must be exercised within some reasonable limits.
Looking upon this respondent as a worthy, respectable and *233 seasonable woman, there is no state or condition of the human mind, short of insanity, which can admit the belief that she either will or can desire to expend the sum of ten thousand dollars a year for her personal support and maintenance. With the plain and simple habits of expense to which she has been accustomed during a long life, she certainly will not now require such an establishment as might be thought suitable for a queen dowager. At her age it would be unsuitable, even ludicrous, to lavish the revenues of a principality in the adornment of her person, and she will not require to be fed like the profligate Egyptian courtezan with pearls dissolved in acid. The allowance of ten thousand dollars a year is manifestly extravagant and excessive, if not vindictive, and is obviously, even confessedly, intended for other purposes than expenditure for support and maintenance. It equals the aggregate amount of the salaries of the chancellor, the secretary of state, the attorney general, the surveyor general and the comptroller. Here are five distinguished gentlemen, learned and talented, filling with ability and honor the highest departments of our state government, associating with the most respected classes of society in this state—fully equal it may be presumed to the first circles of Connecticut, of which the respondent was once the ornament and delight: and yet their united salaries do not exceed what the chancellor has thought proper to allow for the suitable maintenance of one woman. Should the respondent live to the age at which the appellant has arrived, she will be enabled to build churches, to endow hospitals and seminaries of learning, and to distribute fortunes among her friends and favorites. All these objects are laudable, even desirable; but in my opinion they are not within the meaning and design of the statute. Had the respondent been a young woman, and should she live to the age of the appellant, in the practice of a similar economy, her annual stipend, with the accumulations which she might make, would amount to a sum greater than the original cost of the Erie and Champlain canals.
In determining the amount suitable and proper to be allowed for maintenance, I am of opinion that a liberal discretion within *234 the limits of the statute ought to be exercised. Repudiating and rejecting the notion of distribution as illegal, unauthorized, arbitrary and dangerous, I am still disposed to allow a wide margin for the exercise of a sound judicial discretion; that which is uninfluenced by feeling, resentment or prejudice. There is no precise rule by which a proper and suitable allowance can be measured, and I should be unwilling to inter- ■ fere with the judgment of the court of chancery on a subject of this nature, if it did not plainly appear that the intention of the statute had been mistaken or perverted.
In fixing the amount of alimony, reference ought first to be had to the ability of the husband, which in this case is ample. There is no reason for reducing the allowance on account of the limited means of the husband; neither is there any reason for increasing it beyond those limits which a fair construction of the statute would prescribe because his conduct has been mean and' disgraceful. He is a rich, miserable old man; yet he is as much entitled to have his cause decided by the fixed, known laws of the country, as if his morals were without a stain, and his reputation fair as that of the most virtuous and eminent in society. We may then recur to the circumstances and condition in life of the wife, her education, habits, health, the associations to which she has been accustomed, or which she may desire to form, the manner in which she has lived, or rather, in this particular case, the manner in which it may be supposed she would reasonably desire to live. What sum shall be allowed for the maintenance of an aged and respectable woman, the wife of a rich and penurious husband, infirm in her health, and requiring constant care and attendance, accustomed to good society and entitled to enjoy it, indulging not in profusion, but in all the reasonable gratifications which wealth ought to afford ? In such case I would by no means give a stinted and parsimonious allowance. I would rather err on the side of giving too much than too little. I would give as ample an allowance as could be given consistently with the expressly declared object and purposes of the statute, and keeping in view that it is to he reasonably expended in the maintenance of the respondent.
*235 I should think that the sum which is thought a sufficient compensation for the services of the distinguished individual who presides at the head of our judiciary system, would be not merely a a suitable but a liberal and munificent allowance for the maintenance of Mrs. Burr. I shall vote for a reduction of the annual allowance to the sum of three thousand dollars. Excepting the annoyance of having an odious and abusive husband, there is no pretence but that the respondent, during her cohabitation, has been supported in decency and comfort; and the allowance which I propose to make in this case will be admitted to be at least three times the amount which the appellant ever expended for the annual support of his family. I have a perfect conviction that all which may be given beyond the sum I have suggested will be in effect transferring so much property from the appellant to those whom the wife might select as the objects of her bounty. Such a transfer would be an outrage upon law, upon public justice, and private right. The power of making such transfer of property is not yet drawn within the maelstrom of chancery jurisdiction, unless we establish it by the affirmance of this decree.
Another question deserving careful consideration from its very great importance is raised by the appellant’s counsel. It is objected that the chancellor had no power to authorize the respondent to dispose of her alimony by will. In my opinion the root of the chancellor’s error consists in allowing a very large sum by way of alimony, altogether beyond what is suitable for maintenance. Having violated the symmetry of the law and travelled beyond its landmarks, for the sake of consistency he was pushed on to other infractions tending to an unauthorized and arbitrary testamentary disposal of the appellant’s estate. Certainly the married woman cannot dispose of an estate by will, and the chancellor cannot give this power except as he is authorized by the statute. If the power of the court of chancery is restrained, as it ought to be, within its legal statutory limits, no difficulty in regard to this question can arise. The court is not to use the form of alimony for the distribution of estates, but to provide suitably for the maintenance of the wife. I think the provis *236 ions of the statute of divorces give to the chancellor unrestricted and plenary power over the legal allowance of alimony which is decreed to the wife. In no event ought this to return to the husband. The power of disposing of it by will is incidental to the main object of the statute, which is to provide suitably for the wife. It is essential to her comfort, enjoyment and happiness in life that she should anticipate decencies in its solemn and closing scenes. It should not be left in the power of the appellant, on the death of the respondent, to rush like a vampyre and seize upon every thing; withholding the usual and cherished mementoes of departed friendship, and forbidding the customary but vain and empty honors of the grave.
I am of opinion that unless we bring our minds to the conclusion that the sum of ten thousand dollars a year is a proper and suitable sum for this lady to expend for her mere maintenance, we cannot be justified on any legal grounds in affirming the chancellor’s decree. I cannot coincide with the judgment of those, if any there are, who think that this extravagant expenditure would be suitable and proper for a lady in the condition of Mrs. Burr. I am therefore for reducing the amount of the allowance to the sum which I have mentioned, and am in favor of affirming the decree in all other respects.
Lott, Senator.
The appeal in this cause is from the whole of the decree made by the chancellor. The propriety of that part of it which decrees a separation is fully sustained by the proofs, and has not been questioned by the appellant’s counsel on the argument; and the only question is, whether the allowance made for the support and maintenance of the respondent is just and proper.
I fully concur with the chancellor that “ if a case ever called for an extraordinary allowance this is one.” The conduct of the husband has been characterized by acts of cruel and inhuman treatment which admit of no excuse or palliation. It is indeed difficult to conceive a case of a more aggravated character. But notwithstanding these circumstances the court (to use the language of Sir John Nicholl on a similar occasion) “ must not *237 allow any indignant or vindictive feelings to operate in allotting to this lady her permanent alimony.” (Durant v. Durant, 1 Hagg. Eccl. Rep. 528.)
The power of the court of chancery to make any allowance whatever, and indeed to decree a separation, is derived from the statute. It is not within its general authority and jurisdiction. (2 Story's Eq. Jurisp. 803, § 1422; Ball v. Montgomery, 2 Ves. 191, 195; Clancey On Married Women, 549, 550; 1 Fonb. Eq. B. 1, ch. 2, § 6, note (n).) It becomes necessary, therefore, for,a proper disposition of this question, to examine the provisions of law under which the decree appealed from is made.
Upon decreeing a separation it is provided that the court u may make such order or decree for the suitable support or maintenance of the wife and her children, or any of them, by the husband, or out of his, property, as may appear just and proper.” (2 R. S. 147, § 54.) The law had imposed on the husband, as one of the duties growing out of the marriage relation, the obligation of maintaining his wife, and the object of this provision was to enforce that duty. What amount is proper to be allowed for such a purpose must depend on the peculiar circumstances of eabh case.
The yrife is the injured party, and is entitled to such an allowance as will support her in a state of comfort and respectability consistent with her rank and situation in society. In the present case the allowance ought to be liberal. The means of the husband are ample, and his misconduct ought not to deprive her of that to which she would have been entitled if he had fulfilled his conjugal duties; and whatever can fairly be required for her support and maintenance ought to be allowed. The court, however, have not the power to exact the payment of any sum as a compensation for past injuries, or wrongs inflicted on the wife. Such a rule, in the language of the vice chancellor, “ as a means of punishment to the defendant, who is proved to be in the wrong, and for the sake of public example, may afford a more ample weapon, especially when applied to one whose money is his god,” than a mere provision for support; but it is one for the legislature and not the courts to prescribe. Neither *238 can the allowance, in my judgment, he made as a means of the wife’s gratification in the remuneration of those who have harbored and supported her in adversity. These considerations urged by the chancellor, however commendable, are not warranted I think by the act from which the authority of the court is derived.
It does not appear from the facts in this case what amount will be necessary for the proper support and. maintenance of the respondent; but it is evident that it was not contemplated by the court below that the amount decreed was required for that purpose alone. The provision authorizing an investment of the allowance during her life, and a disposition of it after her death, is inconsistent with such a view of the question.
It must be borne in mind that the separation in this case does not annul the marriage bonds. The marriage contract remains inviolate, and the rights of property growing out of the marital relation remain unimpaired. In this respect there is an important distinction between the consequences of a decree for a divorce a vinculo, and a separation merely. In the former case, where the wife is complainant, the court may not only make a decree or order against the defendant compelling him to provide such suitable allowance for her support as the court shall deem just, having regard to. the circumstances of the parties respectively, but it is expressly declared that if she be at the time of pronouncing the decree,<! owner of any real estate, or have in her possession any goods or things in action which were left with her by the husband, acquired by her own industry, given to her by devise or otherwise, or to which she may be entitled by the decease of any relative intestate, all such real estate, goods or things in action, shall be her sole and absolute property.” (2 R. S. 146, §§ 45, 46.) It appears ¡lo me evident from this specific provision for the disposition of the property of the wife in the one case, that it was never contemplated by the legislature to give the court the- power, under the name of support and maintenance, to decree in effect a distribution of the estate of the husband before his death.
The whole policy of the law is against such a construction. *239 Although it permits a decree of separation in certain cases from bed and board, yet the door for a reconciliation is always kept open; and whenever such a decree is pronounced, it may be revoked at any time by the court, under such restrictions and regulations as it may impose, upon the joint application of the parties, and upon producing satisfactory evidence of the reconciliation. (2 R. S. 147, § 56.) Chancellor Kent, in Barrere v. Barrere, (4 Johns. Ch. Rep. 187,) in speaking of cases of this nature says : “ I have always regarded this as a delicate and difficult subject of jurisdiction.” “ There is much embarrassment on the ground of policy and public morality with these partial dissolutions of the matrimonial union. It is throwing the parties back upon society in the undefined and dangerous characters of wife without a husband and a husband without a wife.” “ Opportunity ought to be left and freely left open for reconciliation.”
Can it be supposed that the probabilities of a reconciliation in cases where the allowance makes it the interest of relatives to prevent it, are as great as in those where the amount allowed is adequate for support and maintenance merely? On the contrary, will not the tendency of the principle sought to be established in this case, offer inducements to interested, anxious and expectant relatives, to make breaches in the matrimonial union, and defeat one great design of that relation ? It is true that in this case a reconciliation cannot reasonably be anticipated. Yet such considerations will not justify a departure from the general rule.
It is insisted that the decree in this case is supported by the decisions of the ecclesiastical courts of England. Although the opinion of those tribunals are entitled to great respect on questions affecting the law of divorce generally, yet I cannot consent to take their estimates of the sums proper to be allowed for alimony in England as a basis for our judicial discretion on such a question in this country. It may be observed, however, that no particular rule has been adopted by them. They have been governed by the peculiar circumstances in each case, and I believe it will be found that the allotment of alimony has been made *240 for the subsistence of the wife, and not with a view to a forfeiture of the husband’s property.
In Mytton v. Mytton, (3 Hagg. Eccl. Rep. 657.) which was a case of divorce for cruelty arid adultery, and characterized as one of the grossest in both particulars that ever came to the notice of the court, Sir John Nicholl allotted 10007 a year as permanent alimony, where the gross amount of the real estate was stated to be 60007'per annum, but where the husband claimed to subtract 43507 for incumbrances and the interest of debts which he owed. And in decreeing that amount, he said, in reference to the incumbrances and debts, that the court would not be disposed to allow full deductions for them, but would look rather to other facts in order to judge what should be the wife’s allowance. He added: “ The jointure, of the mother is 1000Z. per annum. That was not considered too large an allowance for his father’s widow, and this unfortunate lady is in a worse situation. Again, her pin-money was fixed at 5007 per annum. A husband who has such a fortune as to give that sum as pin-money, should make an ample allowance for his wife while living separately on account of his misconduct.” In Durant v. Durant, (1 Hagg. Eccl. Rep. 528,) also a case of gross adultery and cruelty, an allowance of 600l. per year was made to the wife, who was in delicate health, out of a nett income of 4000l, in addition to 120l per annum separate property. The husband was a gentleman of fortune and consequence, who moved in the most respectable society, and it appeared that he paid an annuity of 400l. to his mother.
It will be seen that in these cases the amount of alimony was determined not so much by the amount of the husband’s property and income, as by other facts, and the mother’s annuity appears to have been a matter of great weight and influence. The husband had himself fixed a standard by which the judgment of the court was in a great degree regulated. In Smith v. Smith, (2 Phill. Rep. 207, 235,) the sum of 1000l. was allowed to the wife out of an income of 2000l It appeared in that case that the lady was at the time of her intermarriage a widow of large fortune, which, after being settled upon her, she was in *241 duced to'give up to the husband, in the hope of better treatment. Instead of which he lived in adultery in his own house with his housemaid, and exercised continual acts of unkindness and cruelty towards his wife, and in aggravation of his misconduct took away her infant daughter. If ever a case would justify an extraordinary allowance by way of punishment, I think this was one. Yet Sir John Nieholl, in determining the amount to be allowed, said: “ It is a rule of equity that no man shall take advantage of his own wrong. Perhaps it would be but just that where the husband violates the matrimonial engagement, and the fortune was originally bplonging to the wife, he should give back the whole of it. Courts, however, have not gone that length. Yet in such a case as the present the court would give as large an allotment as any.”
In the case of the Earl of Pomfret, (cited 2 Phill. Rep. 43, 110, 236,) the wife, out of an annual income of 12,0001., was allowed one-third of that amount. The facts of that case do not appear. It seems, however, that he was a peer of the realm, and that the wife, although she brought a large fortune, was elevated in rank by the marriage. As this case has been much relied on in support of the decree under review, it may be necessary to give it some attention. It will be recollected that the allowance made to the wife was one-third of the income. The sum seems large I admit, but the husband retained double the amount, and it will be seen that it is stated in Smith v. Smith, before cited, that what weighed in allowing him to retain that amount was that he was a peer, and that the public had an interest adequátely to maintain his station. It would seem, therefore, that 8000Z. a year was deemed necessary for the husband to maintain a proper rank and station in society, and it certainly was not unreasonable that an injured wife should be allowed half that amount. She was entitled, notwithstanding the divorce, to be maintained in a style consistent with the rank to which she had been elevated by the marriage.
In Kempe v. Kempe, (1 Hagg. Eccl. Rep. 532,) a case of adultery, the court said that the wife was entitled to a comfortable subsisten,ce in proportion to the husband’s income. In Rees *242 v. Rees, (3 Phill. Rep. 387,) out of an income of 475l., an allowance of 100l., additional to her separate maintenance of 350l., was made; and Sir John Nicholl said: “ If she had not this property I think the court below would have been called upon to grant her more than 100l.”
It will be seen from these cases that the allowance was fixed at such an amount as was deemed necessary to support the wife in a manner suitable to her rank and station in society, and that the wife’s own separate income was taken into consideration, as well as the means and income of the husband. It may be remarked too that these were cases of adultery, where there was every inducement justified by the law to make the allotment of alimony with the greatest liberality, in which class of cases our law secures to the wife the full and absolute enjoyment of her own property.
I forbear to enquire in this case whether ten thousand dollars a year, (an amount equal to the aggregate salaries of the governor, chancellor and chief justice of this state, and more than the salary allowed to our foreign ministers,) in addition to a dwelling house already secured to her in Lansingburgh, can be deemed necessary for the support and maintenance of the respondent in a style and condition suitable to her rank and condition in society. I have before observed that it is not so considered by the decree, but that other considerations have controlled the court below in fixing the amount; considerations which Sir John Nicholl has thought it unsafe to consider. The great design and object appears to have been to punish the husband, and not merely to provide for the support of the wife. If the legislature had given the court this power, I should have been pleased to support the decree; but believing as I do that such considerations cannot be tolerated, I cannot yield my approval of it.
Again, the case does not show what is the income of the husband’s property. It appears to consist of mortgages to the amount of some $250,000 and upwards, and of various kinds of stocks; but whether they are available or not does not appear, and I think it is not to be presumed that they are all productive. *243 The usual and proper course is to refer questions of this kind to a master. (Barrere v. Barrere, 4 Johns. Ch. Rep. 187.)
It may not be improper to refer to another, branch of jurisdiction conferred by the statute on the chancellor. He has the care and custody not only of idiots and lunatics, but also of persons incapable of conducting their own affairs in consequence of habitual drunkenness, and of their real and personal estate, so that the same shall not be wasted or destroyed. Extravagant, profuse, lavish and unnecessary expenditures, are circumstances always proper to be considered in determining whether an interference of the court is proper in such cases. If a commission in the nature of lunacy against Burr had issued, and the fact should have appeared that he was spending ten thousand dollars a year in the management of his domestic affairs, I believe it would have been considered sufficient proof of his incompetency, and of the waste and destruction of his property, to have justified the appointment of a committee ; and there certainly can be no reason why his wife alone should receive so large an amount for her support and maintenance.
Upon the whole it seems to me that this allowance cannot be sustained. If however I am mistaken on that point, let us en-quire when it should commence.
It appears .that two thousand dollars a year were allowed for temporary alimony during the progress of the suit; yet the decree provides that the permanent alimony shall be allowed from the time of filing the bill. This I think is in direct conflict with the rules and’ practice of the ecclesiastical courts whose decisions have exercised such a controlling influence on the court below in the consideration of the main question. In Shelford On Marriage & Divorce, (p. 594, 5,) it is said: “ The rule of the court is to decree permanent alimony from the date of the sentence of divorce, though alimony pendente lite was neither asked for nor granted.” (See Cooke v. Cooke, 2 Phill. R. 40; Durant v. Durant, and Kempe v. Kempe, above cited.)
Another point remains to be considered. The chancellor has attempted to vest this alimony in the wife as a separate estate, with full power to invest the same and dispose of it “ by will or *244 otherwise during her life, or at her death, as she may think proper, free from any control, claim or interposition of her husband.” It is not even an authority to dispose of it by an instrument in the nature of a will. I have before remarked that a decree of separation does not interfere with the ordinary consequences incident to the marriage relation. The contract of marriage remains inviolate. The wife still continues under the ordinary disabilities arising from coverture. There is no power given in the statute from which the jurisdiction of the court of chancery to allow separation is derived, to vest in married women of this class a right which others are declared incompetent to execute. Our legislature has declared that a married woman cannot make a will. (2 R. S. 56, § 1.) This part of the decree is therefore erroneous.
I am of opinion that the chancellor’s decree should be reversed.
Root, Senator.
In this case Mrs. Burr ought to be allowed a suitable support and maintenance; that is, sufficient to support and maintain an aged lady in as good style as the most wealthy in the vicinity could afford, without appearing ridiculous or insane. I think the allowance for alimony should be reduced to #6000.
On the question being put “ Shall this decree be reversed V the members of the court voted as follows:
For reversal: Senators Bockee, Chamberlain, Faulkner, Lott and Root—5.
For affirmance, The Chief Justice, and Senators Bartlit, Corning, Deyo, Dixon¡ Ely, Franklin, Hopkins, Lawrence, Platt, Porter, Putnam, Scott, Scovil, Strong, Yarns y and Works—17.

 See 10 Paige, 38, 9.

 See Young v. Tustin, (4 Blackf. Rep. 277; Barnard v. Poor. (21 Pick. 378;) Lincoln v. The Saratoga & Schenectady R. R. Co., (23 Wend. 425.)